ROHLOFF, Respondent, vs. AID ASSOCIATION FOR LUTHER-
ANS IN WISCONSIN AND OTHER STATES, Appellant.

*November 8—December 4, 1906.*

*Benefit societies: Actions: Conditions precedent: Abatement: Proofs*
*of death: Amendment: Nonsuit: Suicide: Appeal and error: New*
*trial: Best evidence: Public records: Competency: Hearsay.*

1. Under the regulations of a mutual benefit society its contracts
   of insurance were payable within ninety days after the receipt
   of proofs of death. The original proofs were received nearly
   seven months prior to the commencement of the action, but an
   amendment thereto was received less than ninety days before
   the action was commenced. *Held,* that the amendment did not
   operate as an extension of the time of payment or of the time
   for the commencement of the action, and therefore the court
   did not err in its refusal to abate the action on that ground.
2. Under a certificate in a mutual benefit society providing, in case
   of the death of a member by suicide, that the only liability un-
   der the contract should be the amount of benefit assessments
   paid to the association by the member, the original proofs of

death contained a statement in a physician's affidavit, in answer to a question as to the direct cause of death: "Gunshot wound in heart. Case of suicide," and also a statement of the beneficiary that the insured "was killed by shooting himself in the heart, according .to verdict of coroner's jury." Thereafter the beneficiary, who had no personal knowledge of the manner of assured's death, by amendment stated that she made such original proofs without fully "comprehending or understanding the meaning and import of the same," and that the statement was based on rumors and current talk among citizens. It was contended that by reason of such proofs the court should have granted defendant's motion to abate the action and a subsequent motion for a nonsuit. *Held:*

(1) Such proofs, at most, were mere *prima facie* evidence of the facts therein stated.

(2) The court did not err in refusing to abate the action or to grant a nonsuit.

3. A second proof of death does not nullify a prior proof returned by the company, but such proofs are to be taken together, as supplying each other's defects, and if, combined, they answer the requirements of the policy, the law is satisfied.

4. In an action on a benefit certificate the sole defense was suicide. The jury returned a verdict that the insured's death was not "caused by suicide, whether sane or insane." Error was assigned because the court refused to set aside the verdict and grant a new trial. *Held*, that the verdict was sustained by the evidence stated in the opinion.

5. In an action on a benefit certificate where the only defense was suicide of the member, the court correctly instructed the jury as to the burden of proof, that the presumption of law was against the commission of suicide, and that defendant must overcome this presumption by a preponderance of evidence. The proofs of death and amendments thereto did not deny the fact of suicide nor withdraw a statement of suicide made in the original proofs, and the defendant requested no instructions as to the proofs of death being considered as evidence in the case. *Held* that, the determination of the question whether the deceased intentionally killed himself being for the jury under the instructions of the court, any presumption of suicide arising from the proofs of death was not stronger than the general presumption against suicide, and did not shift the burden of proof.

6. In an action on a benefit certificate where the defense was suicide, a certified copy of the certificate of death made by the health officer, who was also a witness for the plaintiff, was offered, not by way of impeachment, but as original testimony, and was *held* incompetent.

7. In an action on a benefit certificate where the defense was sui-
cide, it is competent to show that the deceased was short in his
accounts with a church, but testimony of a trustee that he had
made partial inquiries among members of the church and found
that certain of them claimed to have made payments to the de-
ceased and taken receipts therefor is mere hearsay.

8. In such case the receipts themselves are the best evidence.

APPEAL from a judgment of the circuit court for Winne-
bago county: GEO. W. BURNELL, Circuit Judge. *Affirmed.*

This action was commenced August 17, 1905, upon a ben-
efit certificate issued by the defendant August 15, 1902, upon
the life of the plaintiff's husband, William Rohloff, and pay-
able to her, which certificate, among other things, contained
the following provisions:

"This is to certify that in pursuance of the articles of in-
corporation and by-laws of this association, and in considera-
tion of the statements contained in his application No. 392
and the benefits and conditions *on the back hereof,* all of
which are hereby made a part of this contract, Mr. William
Rohloff . . . has been admitted to membership in this as-
sociation."

And from the back thereof this:

"In case of the death of the member by suicide, whether
sane or insane, voluntary or involuntary, at the time, the
entire and only liability under this contract shall be the
amount of benefit assessments paid to the association by the
member, as shown by the records of this association, and the
same shall be received by the beneficiary in full settlement
of this contract."

It is conceded that the policy was in full force at the time
of the death of the insured.

The complaint alleges, in effect, that the said William
Rohloff died January 15, 1905; that the plaintiff was his
wife; that she had fully performed all the conditions of said
policy by her and her husband to be performed; that notice
and proof of death were given to the defendant January 21,
1905, and subsequently errors therein were corrected by

amendments; that $2,149.14 and interest thereon from April 21, 1905, was due and payable on the policy; and that the defendant refused to pay the same. The defendant answered by way of admissions, denials, and counter allegations, setting forth the by-laws of the defendant and the provisions of the policy above quoted, and, after admitting the death of the insured, alleges that he "came to his death and died by his own act and by suicide, as the plaintiff then and ever since has well known, . . . as she stated in the proof of loss and death by her submitted to this defendant and in her complaint referred to," in which she stated on oath that "said William Rohloff was killed on January 15, 1905, by shooting himself in the heart, according to the verdict of coroner's jury;" and also alleges the tender back to the plaintiff of the amount of benefit assessments paid thereon of $49.14, but which the plaintiff refused to accept.

Before a jury was called the defendant, on presentation to the court of the articles of incorporation, the proofs of death as mentioned, the subsequent amendment of the same, and the provisions of the policy above quoted, moved to abate the action, whereupon the court ruled: "The court is of the opinion that the plea in abatement, *if there is one,* must be overruled." Thereupon a jury was impaneled and the cause was tried, and at the close of the trial the jury returned a special verdict to the effect that "the death of the said William Rohloff" was not "caused by suicide, whether sane or insane." Thereupon the court ordered judgment in accordance with the prayer of the complaint. From the judgment entered thereon accordingly, with costs, the defendant appeals.

*John Bottensek,* of counsel, for the appellant.

For the respondent there was a brief by *Pierce & Lehr,* and oral argument by *J. E. Lehr.*

CASSODAY, C. J.    1. Error is assigned because the court refused to abate the action. This is based upon the ground

that the amendment to the proofs of death was received by
the defendant less than ninety days prior to the commence-
ment of the action. The original proofs of death had, how-
ever, been received by the defendant nearly seven months
prior to the commencement of the action. Certainly every
amendment to the proofs of death should not operate as an
extension of the time of payment or the commencement of the
action. The original proofs of death contained a statement
in a physician's affidavit in answer to a question as to the
direct cause of death: "Gunshot wound in heart. Case of
suicide," and also a statement of the plaintiff that the in-
sured "was killed on January 15, 1905, by shooting himself
in the heart, according to verdict of coroner's jury." The
circumstances under which the body was found preclude any
personal knowledge on the part of the plaintiff as to the man-
ner in which he came to his death. The amendment was to
the effect that the plaintiff made such original proofs without
fully "comprehending or understanding the meaning and
import of the same," and that the statement above quoted
was based upon rumors and current talk among citizens. It
has been held in New York and sanctioned by text-writers
that a second proof of loss does not nullify a prior proof re-
turned by the company, but that such proofs are to be taken
together, as supplying each other's defects, and if, combined,
they answer the requirements of the policy, the law is satis-
fied. *Brown v. Hartford F. Ins. Co.* 52 Hun, 260, 5 N. Y.
Supp. 230; 2 May, Ins. (4th ed.) § 460. See, also, 19 Am.
& Eng. Ency. of Law (2d ed.) 103.

2. Counsel also contends that by reason of such proofs of
loss the court should have granted the defendant's motion for
a nonsuit. Such proofs, at most, were mere *prima facie* evi-
dence of the facts therein stated. This court held long ago,
in an opinion by Chief Justice RYAN:

"While the Code allows defenses in abatement and bar to
be pleaded in one answer, it does not permit the same de-

fense to be pleaded in abatement and in bar, and where that is done the plea in abatement is a nullity." *Hooker v. Greene,* 50 Wis. 271, 6 N. W. 816.

Upon the authority of that case it was subsequently held by this court:

"While a right to plead in abatement may be waived by pleading to the merits, yet it does not follow that a plea to the merits is to be deemed waived or withdrawn by subsequently filing a plea in abatement. Dilatory pleas are not favored in the law, whereas pleas in bar and to the merits are favored." *Baker v. State,* 88 Wis. 140, 148; 59 N. W. 570. See *Crowns v. Forest L. Co.* 99 Wis. 103, 105, 74 N. W. 546.

There was no error in refusing to grant a nonsuit or to dismiss the action.

3. Error is assigned because the court refused to set aside the verdict and grant a new trial. The claim is that there is no evidence in the record to support the verdict. That verdict is to the effect that the death of the deceased was not caused by suicide, whether sane or insane. That was the only question submitted to the jury. As frankly stated in the brief of counsel for the defendant: "The defense set up was suicide of the insured." That is the only defense on the merits alleged in the answer. The question whether the deceased came to his death in some other way than by suicide was not in issue and not determined. The finding is, in effect, that the deceased did not intentionally or designedly destroy his own life. The evidence as to the circumstances under which the body was found are undisputed. The death occurred on Sunday, January 15, 1905. The deceased was the street commissioner of the city of Appleton. On the evening before the death he was at his office in the basement of the city hall and gave directions to those under him for the work of the then coming week. In the forenoon of the fatal day, at his home and in the presence of his wife and children, he was engaged in cleaning a revolver. On objec-

tion being made, he put the revolver in its usual place in his
wife's dresser.   He was financial secretary of St. Paul's
Lutheran church, and as such was to be present at a meet-
ing of the trustees of the church at 2 o'clock that afternoon.
Shortly after the noon hour he left his home with the church
book, telling his family that he was going to a church meet-
ing that afternoon.   After he left, his wife saw nothing of
the revolver, but knew it was gone.   She saw nothing more
·of him that day.   When he failed to attend the church meet-
ing the witness Dittman was requested to look him up.   He
went to a saloon, and, not finding him there, telephoned his
wife as to his whereabouts, and was informed by her that he
had gone to the church meeting.   Dittman then went to the
office of the deceased, but failed to find him there.   He then
went to the rear door of Hinton's saloon, where he found the
·deceased, and asked him if he did not know he was to be at
the church meeting, and the deceased said "Yes," and took
·out his watch, and said it was half past 2, and he would be
there in a minute.   Dittman then told him that he would
telephone his wife that he had found him, and did so.   The
·deceased then left the saloon with the church book, but did
not go to the church meeting.   About 6 o'clock in the evening
·the brother of the deceased, John, was called up by the plaint-
iff by telephone, and told that the deceased was not at the
·church meeting, and asked whether he had seen him, and
requested John to make search for her husband.   About 7
·o'clock in the evening John and an employee under the de-
·ceased went in search for him.   Finally they went to the city
hall, found the outside basement door locked, then, after ob-
·taining a key at the police station, unlocked the outside door,
and then unlocked the door to the tool room, adjoining the
·office of the deceased, with a wooden partition between them,
having an opening along the top, called "airholes" in the
·testimony.   They then got some boxes, lighted a match and
·the lantern, and looked over the partition through the "air-

holes," and saw the deceased lying on the lounge without a back to it, with his head toward the south. John then crawled over the partition, through the "airhole," and so into the office. The door of the office was locked, and there was no key in the door. He tried to find the keys to the office door in deceased's pants pocket, but failed. Then they tried to break the door in, but could not do so. John then made another effort to find the keys, and finally found them in the right-side coat pocket of the deceased, and unlocked the door, and people came in. When they first saw him on the lounge a revolver was on the floor by the side of the lounge and about eighteen inches from the knee of the deceased, who was lying flat on his back with his head inclined to the east and his hand on his stomach. One leg was straight and one hung over a little. His eyes were closed. He appeared to be asleep. There were three windows to the office, and they extended down below the surface of the ground and within three feet of the floor. There was a handle on the inside of the sash to raise the windows. The curtains on the windows were pulled clear down. The clothing of the deceased lay smooth and not ruffled. The overcoat of the deceased was found hanging on a nail in his office, and his hat was also hanging on a nail. Everything in his office was in order. One of the books of the St. Paul's church was in the office at the time. The deceased was right-handed, and his right side was toward the wall, and the revolver was on the floor on the left of the body. The revolver was picked up by Policeman Baker soon after the body was found, and by him turned over to the chief of police soon after, and on examination the chief of police found that there were two empty shells in the revolver and three loaded ones. There was no evidence of powder marks on his clothing. On reaching the office and finding the dead man Policeman Baker telephoned Dr. Ellsworth the fact and requested him to come to the office immediately, and he did, and got there a little after 9 o'clock, and found three bullet holes through the shirt of the deceased, as

he was lying on the sofa with his ordinary clothes on, over-coat and hat removed. His coat was on, and his vest was open full length, unbuttoned. His shirt, pants, and shoes were all on. The opening in the vest was sufficient to enable him to see two openings, as deceased lay there on the lounge, one just above the left nipple, another about in the median line, and after the removal of the vest he found another open-ing nearly over the collar bone. After opening up the cloth-ing of the deceased the doctor found one bullet hole about an inch above the left nipple on the left side of the breast, being the point of entrance, and it pointed from the left to the right at about an angle of forty-five degrees, taking a course toward the heart and presumed to enter the heart; another just about the median line, the middle of the breast bone, being the point of entrance; and another out over the collar bone, being the point of exit, because it was larger.

It was Dr. Ellsworth's affidavit that was contained in the proofs of loss; and, on being questioned in relation to the statement there made, he testified to the effect that at the cor-oner's inquest the questions and answers all tended towards suicide; that he did not know whether it was suicide or not, but such was the presumption indulged from start to finish; that in answer to a hypothetical question based upon the facts stated he answered that in his opinion it was impos-sible for the deceased to have shot himself. In answer to an-other question he said perhaps it was possible, but it was a questionable case; that, as he stated before the coroner's in-quest, it was never done with the right hand, and if done at all it was done with the left hand.

The physical facts, of which the foregoing is a general outline, are undisputed. The whereabouts and conduct of the deceased from about half past 2 o'clock on that Sunday afternoon to the time his body was found in the evening are wholly unaccounted for and left to conjecture. Can it be said, as a matter of law, that the inferences or conclusions to be drawn from such facts and circumstances are so clear

and unambiguous that reasonable men, unaffected by bias or prejudice, would agree that the deceased intentionally shot himself? If that is not so, the verdict of the jury is sustained by the evidence, and the trial court properly refused to set it aside and grant a new trial. The law on that subject has so often and so recently been declared by this court as not to require repetition here. *Tiborsky v. C., M. & St. P. R. Co.* 124 Wis. 243, 246, 247, 102 N. W. 549, and cases there cited; *Roedler v. C., M. & St. P. R. Co.* 129 Wis. 270, 109 N. W. 88, 91; *Kaples v. Orth,* 61 Wis. 531, 533, 535, 21 N. W. 633. In support of the verdict the evidence is, of course, to be considered in the most favorable light it will legitimately bear. *Id.* The facts in the case are very different from those in cases relied upon by counsel. *Agen v. Metropolitan L. Ins. Co.* 105 Wis. 217, 80 N. W. 1020; *Hart v. Fraternal Alliance,* 108 Wis. 490, 84 N. W. 851; *Voelkel v. Supreme Tent K. M. W.* 116 Wis. 202, 92 N. W. 1104. We must hold that the verdict is sustained by the evidence.

4. In charging the jury upon the question whether the deceased intentionally killed himself the court said:

"The burden of proof is upon the defendant to establish by a fair preponderance of the evidence that the cause of death was suicide. . . . As applied to the facts in this case, it devolved upon the defendant to satisfy you by a preponderance of the evidence that the cause of death was suicide. It does not devolve upon the plaintiff to prove a negative— that is, to prove that it was not suicide,—but the burden of proving it is on the defendant."

And again the court said to the jury:

The "presumption of law is against the commission of suicide, and the defendant must first overcome this presumption in law against suicide, and establish the fact of suicide by a preponderance of evidence, and in the absence of such proof you must answer the question submitted to you by 'No;' . . . but this presumption may be rebutted by proof, and . . . the burden is on the defendant to rebut that presumption and satisfy you by the evidence that the cause of death was suicide."

Counsel for the defendant admits the correctness of such portions of the charge as propositions of law. They are certainly in harmony with the rulings of this court. *Agen v. Metropolitan L. Ins. Co., supra; Hart v. Fraternal Alliance, supra; Voelkel v. Supreme Tent K. M. W., supra.* But counsel contend that as neither the original proofs of death nor the amendments thereof made nearly six months afterwards denied the fact of suicide, nor withdrew the statement of suicide therein made, the presumption of suicide arising therefrom was "stronger than the other general presumption against suicide," and hence shifted the burden of proof from the defendant to the plaintiff. Such proofs were at most *prima facie* evidence of the facts therein stated to be considered by the jury, but that did not require the court to take from the jury the presumption against suicide. Id. The defendant requested no instruction as to the proofs of death being considered as evidence in the case. The determination of the question whether the deceased intentionally killed himself was for the jury under instructions of the court.

5. We perceive no error in excluding from the consideration of the jury a certified copy of the certificate of the death of the deceased, made by the witness Dr. Ellsworth and health officer, and filed in the register's office as required by secs. 1024, 1024a, Stats. 1898. It was not the best evidence and was not offered by way of impeachment, but as original testimony, and was clearly incompetent.

6. The defendant claims that the court improperly excluded testimony as to the amount of money collected by the deceased as financial secretary of the church and his arrears for moneys so collected. In excluding such testimony the court ruled that it was competent for the defendant to show that the deceased was short in his accounts with the church, but that the defendant could not prove by a trustee that he had made partial inquiries among members of the church and found that certain of them claimed to have made payments to the deceased and taken receipts therefor, because the

receipts themselves, which were not produced in court, were the best evidence. Obviously the testimony offered was mere hearsay. We find no error in such ruling.

*By the Court.*—The judgment of the circuit court is affirmed.