CADY, Respondent, vs. FIDELITY AND CASUALTY COMPANY
OF NEW YORK, Appellant.

*November 7, 1907—January 28, 1908.*

*Accident insurance: Notice of injury by insured: Same by beneficiary
in case of death: "Immediate notice:" Knowledge of beneficiary:
Defenses: "Suicide, sane or insane:" Evidence of health of in-
sured: Relevancy: Warranty: Accident: "Local disease:" "Local
affection:" Burden of proof.*

1. Sec. 1966—49a, Stats. (Supp. 1906; Laws of 1901, ch. 235), pro-
   hibiting any accident or casualty company from limiting the
   time for an insured person to serve notice of any injury for
   which he is entitled to make a claim to less than twenty days,
   and providing that a memorandum in respect to the matter
   shall be clearly and conspicuously placed on the face of the
   policy, and further providing that a specified manner of service
   shall be sufficient, does not relate to the claim of a beneficiary
   after the death of the insured person.

2. An ineffective attempt to comply with the law aforesaid does not
   extend beyond the intent so as to relate to a beneficiary, un-
   less the language of the memorandum is unmistakably to the
   contrary.

3. The word "immediate," in an insurance policy, in respect to giv-
   ing notice of any accident or injury for which a claim is to be
   made, by settled judicial construction antedating the policy
   and so a part thereof, means as soon as practicable under the
   circumstances of the case, in the absence of some unmistakable
   limitation to the contrary.

4. Under the foregoing rule service of notice by a beneficiary as
   soon as practicable after obtaining knowledge of the existence
   of the policy is sufficient.

5. Evidence of the state of health of an insured person for a con-
   siderable period of time prior to his death, where it is claimed
   he died by suicide, is proper as bearing on whether the de-
   ceased came to his death as the result of a suicidal intent.

6. The term "death by suicide, sane or insane," does not include
   death by the act of the assured without any mental purpose of
   self-destruction.

7. If one in a fit of delirium or other condition of irresponsibility,
   without intention to take his own life, does some act from

which his death ensues, such death is by accident, not by suicide.

8. The distinction between suicide by a sane person and suicide by an insane person, within the meaning of a policy clause "death by suicide, sane or insane," lies in the mental capability in the one case and the absence of it in the other to appreciate the moral nature and quality of the purpose.

9. A local affection is not a local disease within the meaning of a warranty in a policy of insurance, unless such affection has sufficiently developed to have some bearing on the general health.

10. In case of the defense of death by suicide being interposed in an action on a life insurance policy, the burden of proof is on the defendant to establish such defense.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Wood county: CHAS. M. WEBB, Circuit Judge. *Affirmed.*

Action to recover on an accident insurance policy.

The assured came to his death March 30, 1904, and during the life of the policy. The plaintiff, who was the beneficiary, had no knowledge of the existence of the policy till about sixty days after her husband died. As soon as she obtained such knowledge she complied with the terms of the policy respecting notice to the defendant. The policy excepted from the risk insured against, death by suicide, sane or insane. There was a warranty that the assured at the inception of the insurance contract was in a sound condition, mentally and physically, and that he was not then and had not been within one year prior thereto afflicted with any local or constitutional disease.

The complaint was in the usual form.

The defendant answered, pleading want of notice of the accident immediately after the happening thereof as required by the policy, and that death was caused by an event not within the risk insured against, to wit, death by suicide; also breach of warranty, in that at the time the policy was taken out the assured was afflicted with a local disease, known as stricture, and by other local and constitutional diseases.

The language of the policy material to the case is as follows:

"The *Fidelity & Casualty Company of New York* . . . does insure the person described in said schedule for the period of one year from . . . the day this contract is dated, against disability or death resulting directly, and independently of all other causes, from bodily injuries sustained through external, violent and accidental means, suicide sane or insane not included."

"Immediate written notice must be given the company at New York of any accident and injury for which a claim is to be made, with full particulars thereof, and full name and address of the assured."

"The words 'immediate notice' as used in this policy are to be construed as meaning notice deposited by registered letter within twenty days of the time of the happening of the casualty insured against."

The assured warranted as follows:

"My habits of life are correct and temperate, and I am in sound condition mentally and physically. . . . I have not now nor have I had during the past year any local or constitutional disease."

There was evidence to this effect: The assured complained of having a stricture in October, 1902, which was within one year prior to the date of the policy, and he mentioned the matter again in April thereafter. He went to Hot Springs for his health in February, 1904, and was there operated on for stricture. After remaining at Hot Springs for about a month he went to St. Joseph's Hospital at that place for treatment. Before going there he was low-spirited and his thoughts at times were on the subject of his dying. He said to a friend, in effect, that he did not believe that he would go from Hot Springs alive. During this period he was well enough to be up and about, to take walks, to read the newspapers, and to visit with friends. He went to the hospital March 28, 1904, and was placed in charge of Sarah J. McElroy, a trained nurse. On the day mentioned he sent for an attorney to draw

his will, which was done under his dictation, the will being regularly executed and witnessed. He was somewhat delirious the night thereafter. He was less so the next day, but not entirely free from delirium. The next day the nurse was with him, except about an hour in the morning and for a moment or two prior to the act causing his death. He was much depressed during the day such act occurred. He lay in bed most of the time, occasionally sighing. On one occasion he went to the glass and, observing his face, suggested that he needed a shave. A friend stepped to his bedside and spoke to him, and at noon his wife did so, saying "Good bye," as she was going to dinner. He did not appear to notice either of them. About that time he was asked what he would have for dinner. He replied, "Not anything," but the nurse directed something to be brought, which was done. He ate some ice cream, remarking that it was "mighty good, but pretty sweet." He then called for a drink of hot water. The nurse left the room to comply with such request. When she returned he was gone. She immediately went in search of him. A workman informed her where he was, pointing to an open shaft, which extended down to the first floor. She was on the fifth floor and looking down she saw him on the stone floor at the bottom of the shaft. She reached him as soon as practicable and found both his feet and limbs were broken. He died in about three minutes. The open shaft was about twelve feet in diameter. Around the opening on the fifth floor and on each floor there was a railing about thirty inches high. The only person who witnessed Mr. Cady's movements was Mary Edwards. She saw him going upstairs in a night robe from the first floor. He passed through the hall of what was called the "old building" into and through what was called the "sun parlor," leading into the new building. She called to him. He was going very rapidly. Upon her calling to him he quickened his pace and she ran after him. Upon his arriving at the railing around the shaft he put his hands thereon

and leaped over. He was on the fifth floor and had to go up two flights of stairs to reach it. It was light, there being a skylight in the room. The time was between 12 and 1 o'clock. Miss Edwards was within about an arm's length of Mr. Cady as he went over the railing. He threw himself over, as she said.

There was some conflict of evidence as to whether the assured was afflicted with a local disease at the time of, or within one year prior to, the issuance of the policy.

At the close of the evidence defendant's counsel moved for the direction of a verdict, which was refused. The cause was submitted to the jury, resulting in a verdict in favor of the plaintiff.

For the appellant there was a brief by *Felker, Stewart & McDonald,* and oral argument by *F. C. Stewart.*

For the respondent there was a brief by *Barbers & Beglinger,* and oral argument by *Charles Barber* and *Fred Beglinger.*

The following opinion was filed November 26, 1907:

Marshall, J. Did the court err in not granting the motion for a nonsuit, because there was a delay of some sixty days in giving notice to the company, notwithstanding the memorandum on the policy that "the words 'immediate notice' as used in the policy are to be construed as meaning notice deposited by registered letter within twenty days of the time of the happening of the casualty insured against," and sec. 1966—49a, Stats. (Supp. 1906; Laws of 1901, ch. 235), providing that "the time for the service of any notice of injury that may be required of the person insured" shall not be limited "to a less period of time than twenty full, calendar days;" "the time, not less than twenty full, calendar days, that may be required of any insured person for serving a notice of injury . . . shall be clearly and conspicuously written or printed upon the face of" the policy, and that "the de-

posit in any postoffice by any insured person, his agent or at-
torney, of a registered, postage prepaid letter, containing the
proper notice of injury at any time within twenty full, calen-
dar days after the injury received by the assured, properly
addressed to the company . . . issuing the . . . policy shall
be a lawful and sufficient service of any notice of injury that
may be required?"

It is conceded that the memorandum on the policy in ques-
tion was placed there for the purpose of complying with the
law aforesaid, yet it does not follow such law in letter or
spirit. The statute precludes requiring the insured person
from being limited to less than twenty days for serving notice
of his injury, and provides that it may be served within the
time limited by registered letter. The memorandum on the
policy provides that the only means of serving notice shall be
by registered letter, and instead of plainly providing for a
period for making such service of not less than twenty days
by express language to that effect, it does so by attempting to
contractually construe the word "immediate." Obviously,
we think the service referred to in the memorandum is the
one mentioned in the law, which relates to a claim by the
person insured, not to a claim by a beneficiary after his death.
That might not be entirely clear looking at the memorandum
itself, but it is when such memorandum is regarded as an at-
tempt to comply with the law making it unlawful to limit the
time for an assured person under a policy like the one in
question to give notice of his injury to less than twenty days.

It is the opinion of the court that the statute does not refer
to a death claim made by a beneficiary, as in this case. It
treats from beginning to end of situations where the assured,
himself, has a claim which he, personally, proposes to enforce.

It follows that whether the notice in this case, served by
the beneficiary substantially as soon as she knew of the ex-
istence of the policy, was seasonably served, notwithstanding
the language of the contract that "immediate written notice

must be given the company of any accident and injury for which a claim is to be made," etc., is not affected by the memorandum or the law referred to.

As held in *Comstock v. Fraternal Acc. Asso.* 116 Wis. 382, 93 N. W. 22, the contract as the parties made it must prevail, and what that contract was must be determined within the reasonable meaning of the language which they used under all the circumstances. The court cannot, legitimately, arbitrarily add a stipulation to the contract which the parties did not intend to have in effect embodied therein, merely for the purpose of preventing hardship to some party concerned. If it were an original proposition it would be difficult, if not impossible, to so change by construction the literal meaning of the word "immediate" as used in the policy so as to postpone the time for giving notice till it was possible under all the circumstances to do so, but in view of the state of the law at the time the contract was made there is no serious difficulty in respect thereto. It was then well settled that in case of the person required to give notice not being able to do so from any cause, compliance with the requirement as to notice is sufficient if notice be given as soon as practicable after the disability is removed, unless there is some unmistakable stipulation in the policy to the contrary. That is the effect of *Comstock v. Fraternal Acc. Asso., supra,* following *Kentzler v. Am. Mut. Acc. Asso.* 88 Wis. 589, 60 N. W. 1002, and *Foster v. Fidelity & C. Co.* 99 Wis. 447, 75 N. W. 69. As said in effect in the *Comstock Case,* when the contract was made the language in question, as judicially construed, did not require notice to be given in advance of its being possible to do so under the circumstances of the case, and, therefore, such language must be presumed to have been used in making the contract in that sense. The reasoning leading up thereto need not be repeated here. That the rule adopted applies in case of a beneficiary who fails to give notice of the injury and death of the assured till the lapse of considerable

time thereafter because of ignorance of the existence of the policy, without fault on the part of such beneficiary, is grounded in reason and supported by authorities as the citations called to the attention of the court by respondent's counsel amply show. *Provident L. Ins. & Inv. Co. v. Baum,* 29 Ind. 236; *McElroy v. John Hancock Mut. L. Ins. Co.* 88 Md. 137, 41 Atl. 112; *Solomon v. Continental F. Ins. Co.* 160 N. Y. 595, 55 N. E. 279; *Trippe v. Provident Fund Soc.* 140 N. Y. 23, 35 N. E. 316.

In *McElroy v. John Hancock Mut. L. Ins. Co., supra,* this view expressed by counsel was fully adopted by the court:

"The tendency of the courts has invariably been to take all the facts and circumstances of the case into consideration, and if it appears that the beneficiary has been ignorant of the death, or of the existence of the policy, the time has always been held to date from the acquisition of such knowledge," citing *Kentzler v. Am. Mut. Acc. Asso.* 88 Wis. 589, 60 N. W. 1002, as a leading case, with others.

In *Foster v. Fidelity & C. Co., supra,* this court said in respect to language identical to that under consideration:

"The word 'immediate,' in this connection, means such convenient time as was reasonably necessary under the circumstances to do the thing required."

It follows from what has been said that the court did not err in denying the motion for a nonsuit because of noncompliance with the policy on the subject of notice.

Error is assigned because the court admitted evidence as to what kind of a fever Mr. Cady was afflicted with prior to his death, and as to whether he was in his right mind when he left the room. The evidence was not prejudicial since it was conceded that if he committed suicide, sane or insane, there could be no recovery. Moreover, we are unable to see why the evidence was not proper as bearing on the question of whether there was a suicidal intent on the part of Mr. Cady at the time he committed the act causing his death, which intent was necessary to suicide, as will be hereafter seen.

The court refused to give this instruction asked by appellant's counsel:

"It is immaterial whether Frank A. Cady was delirious or not at the time immediately preceding his death and at the time he went over the railing, if his act in going over the railing was voluntary on his part—that is, that he intended to throw himself over the railing in the manner as shown by the evidence,"—

but instructed the jury in substance that suicide, sane or insane, involved an executed purpose to take one's own life, and that if Cady went over the railing pursuant to a design to take his own life he died by suicide, but if when he committed the act, though it was voluntary and involved carelessness, if it was not with a conscious purpose to take his life; if by reason of his mental condition he did not appreciate the physical nature of the surroundings and consequences of his act and intend to take his life, the result was not suicide within the meaning of the policy.

Whether the court committed error in refusing the requested instruction and instructing the jury as indicated is ruled by *Pierce v. Travelers' L. Ins. Co.* 34 Wis. 389. The position which the court there took in respect to the meaning of a clause in a policy of insurance substantially like the one in question is unmistakable, and has not been departed from by any subsequent decision.

The effect of the decision above referred to is that if one takes poison by mistake, or steps into an elevator shaft, not having in mind for the time being its existence, or falls from a window or any place involving danger while walking in his sleep or flying from imaginary danger, he not having any mental purpose of self-destruction, and death ensues, such result is accidental. The court said, in effect, that death resulting from an act committed under the influence of delirium, as by one who in a paroxysm of fear precipitates himself from a window, or having been bled removes the bandage, or takes

poison by mistake and death ensues, never received nor deserved the name "suicide" and is not within the meaning of the language "death by suicide, felonious or otherwise, sane or insane." Such language does not include an act of self-destruction resulting in death whether intentional or not, unaccompanied by a purpose to effect death, with the absence of all design to take life.

The conclusion reached by the court in the *Pierce Case* is thus stated, referring to the language above quoted:

"The condition here relieves the company from liability only where the self-destruction was intentional, or committed by a party who was conscious . . . of its direct and immediate consequences, though the act may have been unaccompanied by any criminal or felonious intent or purpose."

The opinion of the court, as epitomized in the syllabus and as since understood here and elsewhere, is as follows:

"The words include every case in which the insured kills himself by a *voluntary* act, the natural, ordinary, and direct tendency of which is to produce death, and the physical consequences of which he has a sufficient mental capacity to foresee—in other words, every case of *intentional* self-destruction," and not "cases of unintentional or *accidental* death, though brought about by the act of the deceased involving *negligence* or carelessness."

Thus it will be seen that the court held the distinction between suicide by a sane person and suicide by an insane person lies in the mental capability of understanding and appreciating the moral nature and quality of the purpose. That is made very clear by this language from the early case of *Borradaile v. Hunter,* 5 Man. & Gr. 639, which was quoted and indorsed:

It was enough that it was "the voluntary and wilful act of a man having at the time sufficient powers of mind and reason to understand the physical nature and consequences of such an act, and having at the time a purpose and intention to cause his own death by that act; and that the question, whether at

the time he was capable of understanding and appreciating the moral nature and quality of his purpose, was not relevant to the inquiry, further than as it might help to illustrate the extent of his capacity to understand the physical character of the act itself."

The doctrine announced as aforesaid has since been recognized in a number of cases. *Karow v. Continental Ins. Co.* 57 Wis. 57, 68, 15 N. W. 27; *Scheiderer v. Travelers' Ins. Co.* 58 Wis. 13, 16 N. W. 47; *Bachmeyer v. Mut. R. F. L. Asso.* 87 Wis. 325, 58 N. W. 399; *Fey v. I. O. O. F. Mut. L. Ins. Soc.* 120 Wis. 358, 98 N. W. 206; *Rohloff v. Aid Asso.* 130 Wis. 61, 109 N. W. 989. It is adopted in 2 Bacon, Ben. Soc. (3d ed.) at sec. 336, where many cases are cited, all to the effect that suicide by an insane man involves a suicidal intent.

The foregoing seems to fully justify the court's instruction and the refusal of the one requested by appellant's counsel. The rule governing the subject is so firmly intrenched in our own decisions that it does not seem advisable to go elsewhere for authorities.

Appellant's counsel requested the court to instruct the jury that if Mr. Cady had an organic stricture at the time he took out the policy of insurance, or at any time during one year prior thereto, he had a local disease within the meaning of the policy. The court gave the instruction coupled with an explanation and instructions in the general charge to the effect that if Mr. Cady had an organic stricture it did not constitute a local disease within the meaning of the policy unless the affection was so far developed and had become so serious as to have some bearing upon his general health.

Voicing the opinion of the court, but not entirely my own views, it is considered that the meaning of the term "local disease" as used in the policy was correctly given to the jury. The parties to the contract must have intended to use the term

"local disease" so as not to bind the assured unreasonably. Absurd results are always regarded as not within the contemplation of parties to a contract at the time of reducing the same to writing where their words in any reasonable view will admit of a construction making the agreement reasonable. It is considered that an affection even though curable only by medical or surgical treatment, but nevertheless readily remediable and so not necessarily tending to shorten life, before it has become so far developed as to have some bearing *in præsenti* upon the general health, is not a disease as one would ordinarily understand that term, and that to go further and give to such term, as urged, in the contract in question, its technical meaning would be going too far. Parties are supposed, generally speaking, in making their contracts to use words in their common ordinary sense, and that assumption should prevail in the absence of some reasonably clear indication to the contrary. 2 Parsons, Cont. (9th ed.) 501. It is believed by the court that the conclusion reached is in harmony with the decided cases, notwithstanding there has been no adjudication of the matter, so far as we are advised, on facts the same or very similar to those here involved. *Bacon v. U. S. Mut. Acc. Asso.* 123 N. Y. 304, 25 N. E. 399; *Life Ins. Co. v. Francisco,* 17 Wall. 672, 680; *Rand v. Life Assur. Soc.* 97 Tenn. 291, 37 S. W. 7; *Meyer v. Fidelity & Cas. Co.* 96 Iowa, 378, 65 N. W. 328.

Complaint is made because the court instructed the jury that the burden was upon the defendant to affirmatively establish its claim that Mr. Cady died by suicide. That is ruled in respondent's favor by *Rohloff v. Aid Asso.* 130 Wis. 61, 70, 109 N. W. 989, 992, where the following instruction was approved:

"The presumption of law is against the commission of suicide, and the defendant must first overcome this presumption in law against suicide, and establish the fact of suicide by a

preponderance of evidence, and in the absence of such proof you must answer the question submitted to you by 'No;' . . . but this presumption may be rebutted by proof, and . . . the burden is on the defendant to rebut that presumption and satisfy you by the evidence that the cause of death was suicide."

It should be said in this connection, the court realizes that there are authorities elsewhere out of harmony with the foregoing approved instruction.

The only other point which needs special mention is that the court erred in failing to direct a verdict for the defendant, and, so failing, in not setting the verdict aside as contrary to the evidence and granting a new trial.

It is strenuously urged that the evidence will not reasonably admit of any other inference than that Mr. Cady intentionally jumped, or threw himself, into the shaft to take his life. It is the opinion of the court that reasonable minds might reasonably differ on that question in view of the law as heretofore declared. It does not appear that Mr. Cady had ever been in that part of the building where he went to his death prior to the occasion in question. There is evidence tending to show that he might probably have left his room in a state of delirium and continued in such condition to the instant of the fatal act, not realizing what he was doing. There is evidence tending to prove that when he ran to the side of the shaft he was in a state of alarm and was fleeing from some fancied danger, and that a person in a delirious state is liable to do things dangerous to his own life or the lives of others under a misapprehension of what he is doing and its consequences. On the whole, there is room for belief that when Mr. Cady went over the railing he did not appreciate that he was going into the shaft; that he was not conscious of the nature of his act and have in mind any idea of self-destruction, which, as we have seen, is essential to suicide even of an insane person—one so bereft of reason

as to be incapable "of understanding and appreciating the moral nature and quality of his purpose."

*By the Court.*—The judgment is affirmed.

WINSLOW, C. J., and BASHFORD, J., took no part.

A motion for a rehearing was denied January 28, 1908.