No. 20,020.

BERTHA M. POWER, *Appellee*, V. THE MODERN BROTHERHOOD OF AMERICA, *Appellant.*

SYLLABUS BY THE COURT.

1. INSURANCE—*"Suicide, Sane or Insane"—Instruction—"Accident"— Intention.* In an action upon a beneficiary certificate containing a clause that the certificate should be void in case of insured's death by "suicide, sane or insane," the undisputed facts showed that deceased shot himself through the head with a pistol, almost immediately after having declared his intention to kill himself, and that his death was the result of the pistol shot. *Held,* an instruction that if the jury believed from the evidence that the mental faculties of the deceased "were so obscured and deranged that he did not understand that the firing of said shot was likely to, or would result in his death," his act was in the nature of an accident, and the plaintiff would be entitled to recover notwithstanding the provisions of the certificate, is erroneous. (*a*) Because it excludes all consideration of the intention with which the act was committed, and includes within the definition of "accident" an act of self-destruction, which if committed by a sane person with intent to take his life would be suicide. (*b*) Because there was no evidence upon which the instruction could be based.

2. VERDICT AND FINDINGS—*Accidental Death—Finding Unsupported by the Evidence.* It is held that the finding of the jury that the pistol was discharged accidentally and unintentionally, is contrary to the undisputed facts shown by the evidence.

3. INSURANCE—*"Suicide, Sane or Insane"—No Recovery.* In this case it is held that as the unmistakable extrinsic evidence of deceased's intention to take his own life and the other known facts are inconsistent with the theory of accidental death, or that deceased did not understand the natural result of his acts, the case is controlled by the decision in *Hart v. Modern Woodmen,* 60 Kan. 678, 57 Pac. 936, 72 Am. St. Rep. 380, and therefore the clause in the certificate limiting liability in case of "suicide, sane or insane," prevents a recovery.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge. Opinion filed July 8, 1916. Reversed.

*David F. Carson,* of Kansas City, *Sam Sparrow,* and *James R. Page,* both of Kansas City, Mo., for the appellant.

*J. H. Brady, E. H. Henning, Junius W. Jenkins,* and *Charles E. Thompson,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

PORTER, J.: William A. Power, at the time of his death, held a benefit certificate for $2000, issued by the defendant, a fraternal beneficiary association, and payable at his death to his wife. In this action she recovered judgment upon the certificate and the defendant appeals.

The beneficiary certificate and the application upon which it was issued provided that in the event of Power's death "by suicide, while sane or insane," the certificate should become null and void.

Power was forty-one years of age, and a boilermaker by occupation. His family consisted of himself, wife, mother and his daughter, four years of age. At one time during their married life he and his wife separated and lived apart for about six months. At the time of his death they were living together. On July 22, 1912, Power and his wife attended the funeral of a brother lodge member. They came home on the street car. His wife reached the house first and was engaged in preparing the evening meal when he returned. Soon after entering the house he took up a letter having something to do with his lodge insurance. He called to his wife and said that his rate of insurance had been raised and that his policy was only $1000 instead of $2000. His wife told him he was mistaken and he asked her to come and tell him how she figured it. She replied that she was busy. He thereupon grew angry, threw the paper down and said to his wife that she was "always doing something." He accused her of coming away and leaving him at the end of the car line; she said that she had not done so intentionally. He swore at her and called her a liar and other names too vile to be printed here, and threatened that he would "knock her damned head off." His wife went into the yard where his mother was. Power went into the bedroom, got his revolver, and followed his wife into the yard, cursing her. He tried to coax her into a shed but she would not go, and he held the revolver near his wife's face. She threw her hand up and knocked it aside. He said not to do that as he was not going to hurt her. He stooped down, kissed the little girl and told her "she would not have any papa any more."

"He came over to where I was sitting and told me to come into the house. I refused to go unless he would put the gun away. He was still cursing and crying, called me a liar, foul names, and threatened to knock my head off. After two or three minutes he went into the house. His mother entreated him to hand her the gun but he refused and went into the house and locked the screen door. In less than a minute I heard two shots close together. I forced the screen door open and rushed into the house, found my husband lying on his back on the bedroom floor, blood spurting out from a hole in his temple, mouth wide open, eyes rolling, gasping for breath and gun tightly clasped in his right hand. He had evidently shot himself while standing before the mirror.

"Dr. Nave was called and reached the house in five minutes. My husband never regained consciousness and died in forty-five minutes from the time he shot himself.

"There is no reason on earth that I know of which would have caused my husband to end his life in this manner.

"I have read above statement and certify same to be true and correct.
                    (Signed)        BERTHA M. POWER."

The quoted part of the foregoing is from the proof of loss furnished by the plaintiff to the defendant company. On the trial, however, she qualified some of the statements therein and testified:

"I did not tell Mr. Clark the notary public when he came to take my affidavit to the proof of my husband's death that my husband had committed suicide. I don't know that I told him anything as to what he died from. I knew I had to make proof of my husband's death."

She further testified that the paper was filled out by the notary and that she signed it without reading it. In her account of the circumstances as a witness at the trial she expressed no opinion as to the cause of her husband's death, but her story of what happened did not materially differ from the statements contained in the proof of loss. The certificate of death, sent to the defendant company and signed by the physician who was called in, stated that the cause was suicide, but on the trial the physician testified that the statement was not made from his own personal knowledge.

The trial court gave the following instruction:

"The term 'sane or insane,' as used in the contract of insurance involved in this case, does not include a case of death caused by the act of the insured, William A. Power, without an understanding that the result of the act which he did would cause his death, and if the jury believe from the evidence that William A. Power came to his death by reason of a pistol shot fired by himself and further find from the evi-

dence that at the time he did so his mental faculties were so obscured and deranged that he did not understand that the firing of said shot was likely to or would result in his death, then you are instructed that his act was in the nature of an accident and that the provision in the contract of insurance between him and the defendant that said contract should be void if said William A. Power committed suicide when sane or insane would not prevent the plaintiff recovering a verdict."

The jury answered several special questions, and found that Power came to his death by a bullet fired from a pistol into his head; that the pistol was discharged by himself, but further found that it was discharged accidentally and unintentionally; and they returned a general verdict in favor of the plaintiff.

The instruction complained of presents the main question for determination. The instruction was erroneous. In the first place it is not in accord with the decisions of those courts which have adopted the doctrine that consciousness of the physical consequences of the act and an intention thereby to kill one's self, must appear in order to render effective a clause limiting liability in case of death by "suicide, sane or insane." It excludes all consideration of the intention with which the act was committed, and moreover, includes within the definition of "accident," an act of self-destruction, which if committed by a sane person would be suicide, and thereby absolutely destroy the effect of the plain language of the policy, which declares that it shall be void in case of death by "suicide, sane or insane."

In 17 L. R. A., n. s., 260-270, there will be found a very comprehensive note showing the conflict in the authorities on the question of whether consciousness of the physical nature of the act, and intention to take one's life must appear in order to avoid the policy under this clause. In the note it is stated that a clear majority of the cases which have had occasion directly to decide the point, have held that the clause applies even though the insured was unconscious of the physical nature and consequences of his act and did not thereby intend to kill himself.

The plaintiff asks us to reëxamine the case of *Bigelow v. Berkshire Life Ins. Co.,* 93 U. S. 284, 23 L. Ed. 918, which was cited with approval in *Hart v. Modern Woodmen,* 60 Kan. 678,

Power v. Modern Brotherhood;

682, 57 Pac. 936, 72 Am. St. Rep. 380, a case to which we shall presently refer. It is urged that a reëxamination of the Bigelow case will sustain the instruction given by the court in the present case.

The author of the note above referred to comments upon the apparent misapprehension as to the effect of that decision, arising from the fact that the court, without deciding the point, assumed the insured's consciousness of the physical nature and consequences of the act, or his intention to kill himself, as appears from the following statement in the opinion:

"For the purposes of this suit, it is enough to say, that the policy was rendered void if the insured was conscious of the physical nature of his act, and intended by it to cause his death, although, at the time, he was incapable of judging between right and wrong, and of understanding the moral consequences of what he was doing." (p. 287.)

If it were necessary to decide in the present case whether consciousness of the physical nature of the act of self-destruction and intent to take one's life must be shown in order to render a clause of the kind in question effective, the doctrine declared in the case of *Cady v. Fidelity & C. Co.*, 134 Wis. 322, 113 N. W. 967, 17 L. R. A., n. s., 260, would be very persuasive.

In that case deceased was a patient in a hospital in charge of a nurse, who left the room for some purpose, and when she returned he was gone, but was afterwards found dead at the bottom of an open elevator shaft. The trial court instructed the jury in substance:

" 'That suicide, sane or insane, involved an executed purpose to take one's own life, and that, if Cady went over the railing pursuant to a design to take his own life, he died by suicide; but if, when he committed the act, though it was voluntary and involved carelessness, if it was not with a conscious purpose to take his life; if, by reason of his mental condition he did not appreciate the physical nature of the surroundings and consequences of his act, and intend to take his life—the result was not suicide within the meaning of the policy.' " (p. 330.)

The reviewing court approved the instructions upon the authority of *Pierce v. Travelers' Life Insurance Company*, 34 Wis. 389, the syllabus of which reads:

"1. By the terms of a life insurance policy, the insurer was not to be liable in case the insured should "die by suicide, felonious or otherwise, sane or insane." *Held*, that these words include every case in which

the insured kills himself by a voluntary act, the natural, ordinary and direct tendency of which is to produce death, and the physical consequences of which he has sufficient mental capacity to foreseé—in other words, every case of intentional self-destruction.

"2. It would seem that the words of said condition do not include cases of unintentional or accidental death, though brought about by acts of the deceased involving negligence or carelessness."

In the Cady case, *supra*, the court said:

"The effect of the decision above referred to is that, if one takes poison by mistake, or steps into an elevator shaft, not having in mind for the time being its existence, or falls from a window or any place involving danger while walking in his sleep or flying from imgainary danger, he not having any mental purpose of self-destruction; and death ensues—such result is accidental. The court said, in effect, that death resulting from an act committed under the influence of delirium, as by one who, in a paroxysm of fear, precipitates himself from a window, or, having been bled, removes the bandage, or takes poison by mistake, and death ensues, never received nor deserved the name 'suicide' and is not within the meaning of the language, 'death by suicide, felonious or otherwise, sane or insane.' Such language does not include an act of self-destruction resulting in death, whether intentional or not, unaccompanied by a purpose to effect death, with the absence of all design to take life." (p. 330.)

The Cady case is classified in the note (17 L. R. A. 266) as one of those upholding the doctrine that consciousness of the physical nature and consequences of the act and an intent to kill one's self must appear in order to render a clause of this kind applicable, and the author says that it is also supported by a few other cases in which the point was directly involved.

As suggested, the reasoning of the Wisconsin court appears sound. For it would seem that there must be some distinction made in those cases where death occurs as the result of an accident. Fatal accidents often occur to persons who are insane, accidents which would not have happened had the injured person been sane. It would seem that the reasonable construction of the phrase, "suicide, sane or insane," should include every case in which the insured kills himself by a voluntary act, the nature and ordinary tendency of which is to produce death, that is, every case of intentional self-destruction; and should not include cases of unintentional or accidental death, although the accident is brought about by the careless or negligent act of the deceased.

We think, however, the case at bar is controlled by *Hart v. Modern Woodmen*, 60 Kan. 678, 57 Pac. 936, 72 Am. St. Rep. 380. In the opinion in that case it was said in reference to the added words "sane or insane":

"Such a condition does not admit of an interpretation to include death by accident or by mistake, although it may have resulted from the immediate act of the assured, but under an exception such as we are considering, if the insured purposely takes his own life the insurer goes free." (p. 683.)

The first case cited (p. 683) in support of this doctrine is the Wisconsin case of *Pierce v. Travelers' Life Insurance Company*, supra. It is true that in the Hart case this court neither adopted nor repudiated the distinction between unconsciousness of the moral nature and quality of the act, and unconsciousness of its physical nature and consequences, because, as was stated in the opinion, there was no room for the distinction in that particular case, as the decision was based upon the agreed statement of facts showing that the death was intentional. For this reason it is said by counsel for plaintiff in the present case that the mind of the court is still open upon the question. In our opinion it is still unnecessary for the court to adopt or repudiate the distinction between the unconsciousness of the moral nature of the act and the unconsciousness of its physical nature and consequences. In this connection it may be said that one of the main difficulties with the instruction complained of in the present case is that there was no evidence upon which it could apply.

There is no fact or circumstance in the evidence to take the case out of the rule which was carefully considered and declared in *Hart v. Modern Woodmen*, supra. The facts, about which there is not the slightest dispute, show that the deceased shot himself in the head with a revolver with the declared intention of killing himself. There is no room for quibble as to the inference to be drawn from the facts. The erroneous instruction permitted the jury to wander at will through the realms of imagination and speculation, and without the slightest evidence to support it, to find that he did not know the physical results of firing the loaded weapon into his head. The finding that he did not know was obviously arrived at by the assumption on the part of the jury that a man of

sound mind would not have done the act. It may be conceded that he was insane when he shot himself, and that his act was the result of an irresistible and uncontrollable impulse. But what fact or circumstance appears in the evidence that tends in the slightest way to show that he did not know the physical results of his act, or to sustain the finding that his death was the result of an accident?

"It is further to be noticed that, even if this strict construction were adopted [consciousness of physical consequences], the instances would probably be somewhat rare in which it could be successfully invoked to escape the effect of the suicide clause, in cases where the insured, though insane, died by his own hand under circumstances which, in case of a sane person, would have compelled the inference of suicide, since it is obvious that a consciousness of the physical nature and consequences of the act, and an intention to kill one's self thereby, may coexist with an unsound condition of the mind; and often, of course, even in case of an insane person, there may be unmistakable extrinsic evidence of an intention to kill himself. And frequently, if not generally, even where there is no such extrinsic evidence, there is an almost irresistible inference of such an intention from the very means by which he killed himself." (Note, 17 L. R. A., n. s., 270.)

The known facts in the present case are not only inconsistent with the theory of accidental death, but they conclusively establish that the death was the voluntary act of the deceased. Here we have unmistakable extrinsic evidence of an intention to kill himself. We do not have to rely merely upon the means he used, but his declaration and conduct immediately before he went into the house and locked himself in, leave no room for speculation or uncertainty. No distinction can be drawn between this and the Hart case merely because the plaintiff here saw fit on the trial not to agree to the fact that the deceased intentionally killed himself. The evidence was subject to a demurrer, although none seems to have been interposed.

The instruction complained of had no function except to authorize the jury upon pure speculation to find that the death was accidental, and that deceased did not know the physical consequences of his act. In view of the undisputed facts the Hart case is controlling.

It follows, therefore, that the judgment must be reversed.