TEXAS PRUDENTIAL INSURANCE COMPANY V. ORAL VERA DILLARD

No. A-6211. Decided November 20, 1957.
Rehearing overruled December 18, 1957.
(307 S.W. 2d Series 242.)

16

*Thompson, Knight, Wright & Simmons, Pinkney Grissom* and *David M. Kendall,* Jr., for petitioner.

The Court of Civil Appeals erred in holding that a fact question existed as to the condition of the health of the insured; also in holding that insurer had waived its defense that insured was not in good health because there was no evidence of any waiver. Morris Ass'n of Brownwood v. Tattum, 152 S.W. 2d 871; Hughes v. Am. Nat. Ins. Co., 146 S.W. 2d 470; National Life Ins. Co. v. Travis, 128 S.W. 2d 867.

*Joseph W. Geary, Jr.* and *W. S. Barron, Jr.,* both of Dallas, for respondent.

In answer to petitioner's points of error, respondent cites Coxson v. Atlantic Life Ins. Co., 142 Texas 644, 179 S.W. 2d 943; Vann v. National Life & Acc. Ins. Co., 24 S.W. 2d 347; 45 C.J.S. 720, sec. 725a.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The application for writ of error in this case and the answer thereto present two questions, as follows: (1) As a matter of law on the evidence was the deceased insured, Clarence Gurthery Dillard, not in good health within the meaning of the life insurance policy in suit when the policy was delivered to him on or about April 15th, 1953, by petitioner, Texas Prudential Insurance Company? (2) if he was not, has the petitioner insurer waived the "good health" provision or its right to invoke it in this suit? We hold that the insured was not in good health and that there was no waiver.

The insured applied for the policy on a "nonmedical" basis on March 30th, 1953, the application specifying a death benefit $2,032.00 in favor of his mother, the respondent Oral Vera Dillard. As hereinafter more fully stated in connection with question (2) above, the application form, or page, on which the insured made his application, contained no inquiry as to whether he had epilepsy, and he was not asked that question by petitioner's soliciting agent, nor was a medical examination required. The policy was duly issued as applied for with an effective date of April 15, 1953. The insured died on January 20, 1954. Petitioner denied liability on the policy and this suit was instituted thereon.

The policy provision in question reads:

"This policy shall not be deemed to be in force nor shall the Company be liable hereunder until this policy is manually received by the Insured during his lifetime and while in good health and full settlement made for the first premium called for on the first page of this policy; then upon such delivery it shall become effective as of the effective date of the policy."

The particular defense based on this provision was made the subject matter of a single special issue to the jury, as follows: "Do you find from a preponderance of the evidence that on April 15, 1953 Clarence *Guthery* Dillard was in good health?" The jury answered "Yes." (Other findings confirmed that the insured had actually made representations of good health, or absence of bad health, and of not having consulted physicians within the preceding five years, as set forth in his application. It was also found that these representations were believed by the soliciting agent who took the application. However, further findings were to the effect that such representations were either not false, not material, not relied on by the petiitoner insurer, or not intentionally made. Apparently as a result of these latter findings the petitioner insurer does not at this stage rely on the defense of misrepresentations as such, but only on a breach of the above-mentioned "good health" stipulation in the policy itself.) Judgment was entered for respondent on the jury verdict and the Court of Civil Appeals affirmed. 297 S.W. 2d 265. Petitioner here contends, as it did below, that as a matter of law on the evidence the insured was not in good health on the date in question and that accordingly a valid condition precedent to the policy's becoming effective was not satisfied. American Nat. Ins. Co. v. Lawson, 133 Texas 146, 127 S.W. 2d 294.

The testimony in this latter connection is largely uncontradicted. It appears that the insured was twenty-four years of age at the time the policy of insurance was delivered, was somewhere between five feet, six inches and six feet tall, weighed approximately one hundred and sixty-five pounds, was strongly built and had the appearance of being in good health. Moreover, at that time, there is no evidence of any internal or nonapparent illness or abnormality except as hereinafter stated. At least as early as 1944, however, at the age of 16 years, he had suffered a convulsive seizure of a type commonly associated with epilepsy. About a year and a half later (1946) he joined the Army, but within less than two months thereafter was given a medical discharge for "psychoneurosis, conversion reaction." In August and October, 1947, he consulted a Dr. Rounsaville, whose testi-

mony is hereinafter discussed. This physician prescribed for him dilantan sodium, a sedative kind of drug generally prescribed only for epileptics, which tends to suppress convulsions. While the insured took this medicine more or less regularly thereafter, in the latter half of 1948, he entered, and spent approximately a month in, a Veteran's Administration Hospital, where his illness was diagnosed as epilepsy and where he suffered additional convulsive seizures.

Except for his time out at the hospital in 1948, he evidently worked more or less regularly, although for different employers, from the time of his medical discharge from the Army in 1946 until May, 1953, or very shortly after he took out the policy in suit. At that time he ceased work for some two months, resuming employment in July, 1953, only to stop again some four months later — in November, 1953. While still unemployed, on January 17th, 1954, he began to suffer a series of continuous convulsive seizures, which culminated in his death on January 20th. Although the record does not give the specific dates of all, or even many, of his seizures, nor connect them clearly with his periodical suspensions or changes of employment, the only fair inference is that, between 1944 and the onset of his final series of convulsions in January, 1954, he suffered an average of more than one seizure per year, including at least one in each year prior to taking out the policy in suit in 1953.

The principal witnesses testifying on behalf of the respondent beneficiary as to the generally healthy appearance and activity of the insured were the respondent herself, her daughter (sister of the insured) and a young lady, Mrs. Caldwell, who, prior to her marriage, was a high school classmate of the sister and friend of the latter and the insured. The first two witnesses lived in the same house with the insured up to and including the time the policy was taken out. However, Mrs. Caldwell appears to have known him largely as an incident to her acquaintance with his sister, and seems to have seen little of him after 1948, around which time she apparently married Mr. Caldwell. All of these witnesses testified unequivocally to the fact of the respondent's having seizures prior to the time he took out the policy, and the portion of their testimony pointing toward good health of the insured is obviously qualified accordingly.

A sample of the testimony of the respondent is:

"Q. Now, from your knowledge, do you know whether Clarence had Epilepsy?

"A. Well, that is what they called it. Now, I don't know. As far as I know * * * that is all I know.

"Q. From 1948, from the time he got out of the Army up until the time of his death, tell this jury approximately how often he would have such attacks, if he had them at all.

"A. Well, sometimes he would go as high as almost a year; and sometimes then he would have one in six months * * * go six months without having one.

"Q. Now, except for the interval of time in which he was actually having such an attack, did he ever evidence any other symptom of ill-health to you?

"A. No, sir, not ever."

The respondent also confirmed that the insured went to the Veteran's Hospital in 1948.

Samples of the testimony of the sister are:

"Q. Did you ever observe anything else concerning Clarence's condition other than these periodic attacks that he might have?

"A. No, sir.

"Q. Tell this jury the frequency, if at all, of any attacks that Clarence might have had.

"A. You mean how often?

"Q. Yes.

"A. I know one time he went a year or so without having one.

* * * * *

"Q. He did have seizures?

"A. He had seizures, yes.

"Q. Was he taking dilantin all the time?

"A. He was taking some medicine. I guess that is what it was. I think that is what they called it.

"Q. Did he ever not take the dilantin or the medicine?

"A. Yes.

"Q. On what occasions did he not?

"A. He would stop taking it to see if he was cured. I mean, he would think he had taken it long enough to be cured, and he would stop to see if he was cured.

"Q. When he stopped taking it, then what happened?

"A. After so long a time he would have a spell."

The sister also testified to the details of a typical seizure of the insured, describing them as convulsive in character. She stated that she considered him to be in danger of strangling at such times and that his brothers, if present, "would get a spoon or something and hold his tongue to keep him from biting it." She also referred to seizures occurring while the deceased was seated and while he was standing, stating that in the latter instance he would fall down and, upon regaining consciousness thereafter, "would complain of headaches and he would know if he had hurt himself." Mrs. Caldwell although obviously not in the company of the insured nearly as often as were his mother and sister, admitted to witnessing his seizures on "two or three" occasions. The other witnesses as to the healthy appearance and conduct of the insured, to wit, Mr. Caldwell and the insurance agent, Leonard G. Killough, were clearly not in a position to, and did not purport to, contradict the fact of the seizures, nor did any witness purport to do so or to minimize their dramatically serious character. Nor, unless as above noted, did any witness purport to minimize the number of the seizures occurring prior or subsequent to the taking out of the policy.

Dr. Rounsaville above mentioned was the only medical witness at the trial. He testified that the insured probably had epilepsy even during such times as his seizures were suppressed by medicine. He also testified that there are three types of epilepsy characterized by their respective types of seizure and known, respectively, as grand mal (French for "greatly bad") petit mal (French for "little bad") and psychomotor seizures; that grand mal seizures are manifested by a stiffening of the

muscles, unconsciousness and convulsions, followed by sleep (precisely the characteristics of the seizures of the insured as described by family witnesses for the respondent beneficiary) ; that petit mal seizures are usually experienced by children and are manifested by a brief period of day-dreaming or staring into space, no convulsions; that psychomotor attacks are of much smaller magnitude and are manifested by a temporary unawareness of what the victim is doing.

As stated, following his consultation with Dr. Rounsaville in August and October, 1947, the assured took more or less regularly the dilantin sodium which the doctor then prescribed, except that, as described by his sister, he undoubtedly suspended taking it from time to time in the evidently vain hope of detecting progress toward a cure. On the day in which his fatal series of seizures began, the insured sent his brother to have the prescription refilled, and a seizure followed shortly after his taking the first capsule of the medicine thus obtained. The insured continued to take the same capsules, but continued to have seizures in rapid succession until his death three days later. As to the character of the particular medicine thus taken, the only testimony was that of the respondent and Dr. Rounsaville. The former said she thought the capsules were smaller than the ones theretofore taken and showed some of them to Dr. Rounsaville after the death of the insured. The doctor, in turn, testified rather vaguely as follows:

"Q.  Did she show you any of the * * *

"A.  (Interrupting) Yes, sir, she did.

"Q.  Do you know what those were?

"A.  Well, I couldn't categorically say. In my opinion, they looked more like delvinal sodium instead of dilantin sodium, which is a sedative made by Sharpe & Dohme.

"Q.  Would delvinal sodium have any beneficial effect on a person suffering from epileptic seizures?

"A.  It could if it were strong enough to curtail the seizures. It's a sedative."

Dr. Rounsaville also testified that he knew of no cure for epilepsy and that, as before stated, the insured probably had

epilepsy while his seizures were suppressed by dilantin sodium. His testimony, including that last above quoted, is to the effect that dilantin sodium, while generally prescribed only for epileptics, is a sedative, that is, something calculated to relieve the effects of a disease rathern than to cure it. He also testified as follows:

"Q. And as long as this Dilantin Sodium is taken, a man won't have epileptic seizures, will he?

"A. If the dose is adequate and he stays on it.

"Q. That's right. And he can lead his normal life and do anything anybody else can do as long as he takes that drug, can he not?

"A. As long as his seizures are under control.

"Q. Yes, sir. And he can work and he can have a normal life in every respect, isn't that right?

"A. Yes, sir.

"Q. And as long as he takes that Dilantin, he is in sound health for all purposes?

"A. Yes, sir."

■ There is no doubt that at the time the policy was issued, the insured was afflicted with a disease that produced and had been producing, the same sort of seizures or convulsions from which he died some nine months later. We further conclude that the minds of reasonable men could not differ from the view that the disease in question was epilepsy, and of the worst type. The generally "normal" appearance and behavior of the insured and the even robust character of his general physique lose all of their significance as evidence of good health or against bad health, once it is made clear, as it is, that, at the critical time, he actually had the disease and in its worst form. Proof of the outward appearance of good health may well make the issue one of fact in many, even most, cases, but obviously not in every one. An individual may appear quite robust to his employer, family and friends and he himself conscious of no serious ailment and yet turn out to have had beyond doubt a dangerous disease that no insurer would care to risk. To say that such testimony of ap-

parent good health is admissible is not necessarily to say that it creates a fact issue regardless of all other evidence in the case.

This being so, we think the case falls within the scope of the rule stated in Wright v. Federal Life Ins. Co., Texas Comm. App., 248 S.W. 325, and American National Ins. Co. v. Lawson, supra, to the effect that, where the insured, at the time of taking out a policy with a "good health" stipulation such as that before us, is suffering from a serious kind of illness, which continues and eventually causes his death, the condition of "good health" is not fulfilled. The insured undoubtedly having epilepsy of the most serious type when he took out the policy in 1953 and undoubtedly dying from it some nine months thereafter, he was as a matter of law not in good health at the former time, and the finding of the jury to the contrary should have been disregarded.

The only serious argument that can be made to the contrary is that based on the above-quoted statement of Dr. Rounsaville to the effect that if and so long as the insured should take dilantin sodium at the proper times and in the proper dosages he would be in sound health. The statement was not one that the insured was in good health, and even if it had been, it would not have supported the verdict in the face of the undoubted fact (which the doctor did not pretend to question, but in fact confirmed) that the insured had epilepsy and soon died from it. To alter the legal result of these undoubted facts on the strength of a doctor's opinion that the insured was in good health notwithstanding such facts would be to accept the doctor's legal definition of good health rather than the court's. This we could not do. The kind of testimony given by Dr. Rounsaville might, indeed, be apt for certain situations—for example, one in which there were a question as to whether the illness which ultimately proved fatal was yet, at the time the policy was delivered, in such a stage as not to be classed as serious. Evidently there is an area in which persons actually having a disease are yet properly held to have been in "good health" at the time, although they later grow worse for lack of medical attention and die.

We are cited to no decisions which persuade us against the foregoing views.

In Poignee v. John Hancock Mut. Life Ins. Co., 147 S.W. 2d 677, (a two-to-one judge decision of an intermediate appellate court of Missouri, which the Supreme Court of that state de-

clined to review "on the merits" for lack of conflict with another decision. State ex rel John Hancock Mut. Life Ins. Co. v. Hughes, 348 Mo. 829, 155 S.W. 2d 250, the insured had diabetes a few years prior to receipt of the policy and died of diabetes, but it was not clearly established that he had diabetes when he received the policy. The court said that the latter question was "the supremely important question" in the case and held it to be for the jury, there being no proof that diabetes once existing would necessarily persist nor other proof conclusively showing the insured to have still had it when he received the policy. There was no contention that having the disease might, on the evidence, be consistent with a state of good health by reason of the availability of medicine that would keep it in abeyance.

Sovereign Camp W. O. W. v. Derrick, Texas Civ. App., 64 S.W. 2d 982, wr. of er. refused, is essentially similar to the Poignee case, supra, in that, while the insured admittedly died of cancer slightly over two months after the time when the insurance contract required him to be in good health, nevertheless, there was a serious question as to whether the cancer had actually existed as a disease at the critical time. The insured had a mole on his body which had evidently existed for a long time without any ill effects whatever upon him, but which during the relevant period, began to evidence abnormality by bleeding. The court upheld a jury finding of good health, but clearly on the single theory that the erstwhile innocuous mole was not conclusively shown to have been a cancer at all at the critical time. Relevant language from the opinion in this connection is quoted in the footnote.[1] The case definitely does not hold that, admitting the insured to have had cancer at the critical time, there was yet a fact question as to his good health because of testimony that the disease could have been retarded or kept in abeyance by medical means. If there is any inference to be drawn from the case in this latter connection, it is that actual

---

[1]"We do not understand that a disease or ailment which affects the general soundness and healthfulness of the human system seriously to embrace an 'affection even though curable only by medical or surgical treatment, but nevertheless readily remediable and so not necessarily tending to shorten life, before it has become so far developed as to have some bearing in praesenti, upon the general health.' Cady v. Fidelity & Casualty Co., 134 Wis. 322, 113 N.W. 967, 971, 17 L.R.A. (N.S.) 260. And such affection would not constitute a bodily infirmity of a substantial nature, nor materially or necessarily increase the risk of the insurer, nor could it be said such an affection constituted bad health. *Hence the very time of the inception or the beginning of the ravages of the terrible disease with which James E. Derrick died, is all important in this case* as there is no room for doubt but what he died as a direct result of metastases from a melano sarcoma." (64 S.W. 2d 982, 983; emphasis supplied.)

existence of the cancer at the critical time would have avoided liability of the insurer.

The court in the Derrick case cited Cady v. Fidelity & Casualty Co. of N. Y., 134 Wis. 322, 113 N.W. 967, 17 L.R.A. (U.S.) 260 (1907), which involved a warranty of the insured that he was in good health "and not afflicted with any local or constitutional disease." Actually, the insured died by jumping or falling down an elevator shaft in the hospital in which he was confined after undergoing surgery on account of a "stricture;" but the "good health" provision was nevertheless invoked by the insurer, and there undoubtedly was strong evidence that the ailment in question, the nature of which does not fully appear, existed upon the delivery of the policy. The actual decision merely upheld a jury instruction by the trial court to the effect that "an organic stricture" was a "local disease," but would not be such " * * * unless the affection was so far developed and had become so serious as to have some bearing upon his general health." Even the broader implications of this holding amount to no more than that a disease existing at the time of delivery of the policy must be of a serious, as distinguished from trivial, nature in order for the "good health" provision of the policy to be breached. The case obviously does not cover the point of whether the actual existence of an otherwise admittedly serious disease may be consistent with a state of good health merely because the disease could have been kept in abeyance by medicine, although actually it was not.

Coxson v. Atlanta Life Ins. Co., 142 Texas 544, 179 S.W. 2d 943, likewise involved only the question of whether the disease (pulmonary tuberculosis) actually existed, or existed in serious form, at the time of delivery of the policy, the insured having gone to the hospital with active tuberculosis only some two months thereafter, and having died therefrom about fourteen months later. The evidence was, indeed, almost conclusive to the effect that the disease was "active" prior to the policy delivery, and a jury finding of "good health" was upheld largely on the strength of general evidence from lay witnesses as to the normal appearance and activities of the insured before he went to the hospital. Nevertheless, the point involved was not whether, assuming the insured to have had "active" tuberculosis at the critical time, he might yet be considered in good health because of the ready availability of effective treatment for the disease.

Vann v. National Life & Accident Insurance Co., 24 S.W. 2d 347, sustained a verdict of good health in a case where the

insured undoubtedly had a cancer only a month before delivery of the policy, undoubtedly had a cancer of the same organ some five months following the policy delivery, and undoubtedly died from cancer of the same organ some four months thereafter. During the early part of the month the policy delivery she was given radium treatment, and there was medical testimony to the effect that she showed considerable improvement in the brief period between the end of the treatments and the policy delivery, no signs of the cancer being apparent to her physician about that time. There was also some medical testimony from which it could have been inferred that under these circumstances the cancer might never have recurred during the balance of the lifetime of the insured, although the same physician also testified that "we do not consider them in sound health for a period of five years." There was also lay testimony from the beneficiary's husband and a daughter that at the time in question the insured appeared and acted as if in normal health. Even in that case, however, the point at issue appears to have been whether, considering the nature of the particular disease, the insured actually had it at the time in question or, in other words, whether the disease might not have been regarded as cured.

The same distinction is applicable to American Home Life Insurance Company v. Zuniga, 5 Cir., 228 Fed. 2d 403, which was a cancer case and purported to follow the Derrick, Coxson and Vann cases, supra.

■ As to the further question of whether the petitioner insurer has waived, or is estopped to assert, the "good health" provision of the policy, the burden of requesting any necessary jury issues was upon the respondent. The record does not show, and she does not assert, that she requested any and, none being submitted, she has waived the point, unless waiver or estoppel is established as a matter of law, as the respondent argues that they were. Rule 279, Texas R. Civ. Proc. The facts are, in our opinion, against the respondent's contention.

The declaration which the insured signed by way of an application all of page 1 of a four-page printed document, or set of documents, in regular use by the petitioner, and consisting of a very large sheet doubled over so as to make in effect two smaller sheets or four pages.

Page 1 was in effect a separate form by itself containing numerous questions to be answered by the applicant, these being

immediately followed (at the bottom of the page) by spaces for the date and signatures of the applicant, the soliciting agent, and other insurer representatives. At the top of the page in large type were the following words:

"FOR USE OF APPLICATION, SEE NOTE 1 ON PAGE 4 NON-MEDICAL "APPLICATION TO THE TEXAS PRUDENTIAL INSURANCE COMPANY

"Galveston, Texas."

This form, or page, called for, and the insured made and certified by his signature, all the required statements, including the following: (a) In the blank corresponding to any military medical discharges received, the declaration is "Stomach disorder. Works every day, never goes to Dr. Does not bother him." (b) The inquiry as to whether the applicant had "consulted or been treated by any physician or physicians for any cause whatever during the past five years" is answered, "No." (c) To inquiries concerning past illness, the answer was that the applicant had never had any disease and did not at the time of the application have "any physical or mental defects * * * or disease of any kind." The only express inquiries about particular ailments were as to whether the applicant or any of his family had ever suffered from tuberculosis or insanity. These were answered in the negative, as was the further question of whether the applicant had ever been refused life insurance or "rated up."

Page 2 (reverse side of 1) and page 3 together constitute in effect a second and separate form, beginning at the top of page 2 with the title, "PART II. TEXAS PRUDENTIAL INSURANCE COMPANY APPLICATION. DECLARATION OF APPLICANT IN LIEU OF MEDICAL EXAMINATION." Following this title and in much more extended form than on page 1, is a set of detailed inquiries of a medical nature and otherwise, including whether the applicant had ever been "affected with" any one or more of some fifty or more listed specific ailments, including "epilepsy." This form, in effect, duplicates inquiries contained on page 1 with regard to tuberculosis, insanity and sundry other matters, but not the inquiries of page 1 as to various other matters such as age and address of the applicant, name of the beneficiary, and particular character of the insurance applied for. At the end of this "Part II" (as to the end of pg. 1) are found spaces for date of application and signature of

the applicant. No part of pages 2 and 3 was filled in, nor does any signature appear thereon.

There is no reference in the page 1 form to the pages 2-3 form, and no express reference in the latter with respect to the former.

The top of page 4 bears the title "AGENT'S REPORT," and the questions following include one as to the applicant's appearance as indicating "good health and a strong constitution." This latter question was answered "Yes," and the other questions were also answered, the soliciting agent signing at the bottom of this particular form in the place provided for his signature.

At the bottom of page 4, separated from the agent's signature appear several "notes," including the "Note No. 1," referred to in the title on page 1 above mentioned. This note is copied below.[2] The application, as before stated, called for $2,032.00 insurance. At the trial an official of the petitioner insurer testified that, "If the amount of insurance of an ordinary policy is less than $3,100.00," only the forms on pages 1 and 4 are to be filled out, whereas, for amounts between $3,100.00 and $5.000.00 the form on pages 2 and 3 must also be used, while for amounts over $5,000.00 a regular medical examination is required. This testimony was in nowise contradicted, and finds confirmation in the "Note 1" above mentioned, although the latter is not altogether clear to the casual reader in and of itself.

■ The soliciting agent who took the application did not display a very accurate or consistent memory, but did testify without contradition that he did not ask whether the insured had had epilepsy or convulsions, had no information to this effect, and accepted as true the above-mentioned answers of the insured reflected on the page 1 form with regard to the Army medical discharge, the absence of any disease or physical defects and the matter of not having consulted physicians. (The jury, as before stated, found that the insured actually made all these statements, and that the petitioner insurer and its agents

[2]"Note No. 1. Complete pages 1 and 4 for Age 0 to attained Age 1, for amounts up to $2,500.00; from attained Age 1 through Insurance Age 45, for amounts not exceeding $3,100.00, Standard Risks only. For all other cases up to and including $5,000.00, the entire application must be completed. When only pages 1 and 4 are to be completed, no Inspection is necessary. The writing Agent's Report on page 4 must be completed in all cases. Regardless of the amount of Insurance applied for, if the applicant is a female, PART II on page 3 must be completed.

"When Payor Benefits are desired and Payor is not over Insurance Age 45, complete this form on the Payor in addition to application on the child."

believed them.) There is no proof that the petitioner insurer or its agents knew, or had any reason to suspect, that the insured had suffered from epilepsy or seizures or any other serious ailment, unless such knowledge be inferred, as the respondent seems to think it should be, from his answer of "Stomach disorder" to the inquiry about his service medical discharge. In this connection, the record discloses no jury issue or request therefor, should such be relevant, as to any negligence of the petitioner in believing, as it did, what the insured stated or in failing to investigate the matter otherwise.

In Lee v. Mutual Protective Assoc. of Texas, Texas Civ. App., 47 S.W. 2d 402, wr. of er. dism., which is cited for the respondent, the application answered the "good health" question with the words "In bed part of the time," and the insurer nevertheless issued the policy, the insured dying shortly thereafter. The insurer's defense based on the "good health" provision of the policy was rejected in the following language:

"It is just as certain under the decisions that, if the association *had knowledge* of the fact that Mrs. Lee, at the time the certificate was delivered to her, was not in good health, or (what we construe to be the same thing) was in such state of health as required her to be in bed part of the time, its act in delivering the policy *with such knowledge,* and collecting the dues thereon, renders said provision in the certificate as against the pleas of wavier and estoppel unavailable as a defense. We need not stop to inquire whether such defense be accurately denominated a 'waiver' or an 'estoppel.' (47 S.W. 2d 402, 404; emphasis supplied.)

At a further point in the opinion, the court said:

"We now pass to the more difficult question of whether the court's findings show that the association" [as distinguished from the soliciting agent] "had *knowledge* when the certificate was delivered that Mrs. Lee was not in good health. The existence of waiver or estoppel, it must be borne in mind, is dependent upon the existence of such *knowledge*." (47 S.W. 2d 402, 405; emphasis supplied.)

The rule thus stated does not apply to the instant case, in which there was no "knowledge" on the part of the insurer, and in which any conceivably relevant fact issue of negligence in not knowing was waived. Nor do we know of any decision or

rule restricting rights of an insurer under a "good health" provision to cases in which it has made an investigation of the applicant's health apart from his own declarations or cases in which it has expressly asked him about the particular disease from which he died. Actually we know of no requirement that the applicant be asked anything at all about his health as prerequisite to enforcement of the "good health" provision. And if the insurer chooses to ask only general questions except as to one or two diseases, we know of no rule saying that it thereby waives its policy rights as regards all diseases not specifically asked about.

Thus the contention boils down to whether the claimed waiver necessarily follows from the mere fact of the insurer having available both the "Part II" form (pages 2-3) with questions about epilepsy (and some fifty or more other diseases) and the short form on page 1 and electing to use only the latter. The logic of such a contention, if sound, would mean a waiver of the "good health" provision with regard to virtually every disease known to science, since most of them are included in "Part II" in addition to epilepsy. Obviously any such waiver would not be a consensual one, the applicant evidently not knowing about "Part II." As to any *ex parte* waiver by the petitioner, the latter being under no obligation to ask about particular diseases, the page 1 form being evidently a complete form in itself and neither form containing any reference to the other, an inference of intent to waive would hardly follow without more evidence to support it. Such other evidence as there is, to wit, the "Note 1" and the uncontradicted proof that "Part II" simply was not used in applications for less than $3,100.00 insurance, tends to weaken, rather than support, the inference and certainly keeps it from being established as a matter of law.

We are also unable to agree with the additional theory of waiver or estoppel based on the alleged conduct of the petitioner in declining the claim on grounds other than the policy provision in question. True, the brief letters of the petitioner, on which the respondent relies, did speak in terms of the insured misrepresenting or withholding the facts in connection with his disease and did not expressly refer to the "good health" provision of the policy. However, the omission was, at worst, a formalistic one, hardly calculated to mislead, or prejudice the position of, the respondent; and there is no finding or proof in the record to indicate that it did so. The only decision cited for the respondent on this point, National Aid Life Ass'n v. Murphy, Texas

Civ. App., 78 S.W. 2d 223, wr. of er. dism., may, indeed, stand for the proposition that the declination of a claim on one ground may estop the insurer from asserting a distinct ground later, where the delay has been prejudicial to the claimant. However, we do not find it applicable to the facts of the instant case, which are substantially different.

■ Our holdings require both a reversal of the judgments below and a rendition of judgment that the respondent take nothing, unless we consider that the case has not been fully developed in respect of the issue of good health of the insured. See cases collcted under notes to Rule 505, Franki's Vernon's Annotated Texas Rules. While we have some doubts in this latter connection, we note that the respondent's otherwise rather elaborate brief contains no request for a remand in the event we should agree, as we do, with the position of the petitioner on the issue mentioned. From this we assume that the respondent considers the case fully developed from her standpoint, and we accordingly conclude that both judgments below should be reversed and judgment rendered that the respondent take nothing. It is so ordered.

Associate Justice Greenhill not sitting.

Opinion delivered November 20, 1957.

MR. JUSTICE CALVERT, joined by JUSTICES SMITH and WALKER, dissenting.

I respectfully dissent.

The majority recognize that the judgments of the trial court and the Court of Civil Appeals may be reversed only if the record before us shows, as a matter of law, that the insured was *not* in "good health" within the meaning of the policy of insurance on April 15, 1953. In answer to the only special issue pertinent to our review the jury found he was in good health on that date. In submitting the issue to the jury the trial court defined "good health" as follows: "The term 'Good Health,' as used in this charge, does not mean absolute perfection. It means that a person has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness or healthfulness of the system." Petitioner did not object to the definition and does not complain of it here.

The evidence bearing on the question is relatively brief and simple, and is undisputed. The insured was an epileptic. The epilepsy was of the grand mal type and had its inception at least as early as 1944. He first consulted a doctor — Dr. John Rounsaville — in August and October of 1947. Dr. Rounsaville prescribed, and the insured thereafter regularly took, dilantin sodium, a drug calculated and intended to prevent epileptic seizures, except that occasionaly he would stop taking the medicine for a few days to test himself to see if he was cured. He had seizures on the average of about once a year. In spite of his affliction and its need for constant and continuous medication he was strongly built and appeared to his friends and relatives to be in good health. He led a normal, healthy life. Except for brief intervals between jobs he worked regularly from the time of his discharge from the army in 1946 until November, 1953. There is no evidence in the record that the insured's frequent change of jobs or his unemployment from November, 1953 to the date of his death in January, 1954 were due to conditions of health, nor is there any evidence from which we may fairly and reasonably draw such an inference. Even petitioner's agent who took the application for the policy testified that the insured appeared at that time "to be in good health" and that he did not observe "anything, act or characteristic" about the insured which would lead "to any conclusion other than that he was in good health." Such is the state of the non-expert testimony.

The medical or expert testimony and evidence in the record is found only in the testimony of Dr. Rounsaville and in the records of a Veteran's Hospital, both offered in evidence by petitioner.

The insured entered the Veteran's Hospital in McKinney, Texas on August 20, 1948, where he stayed for a period of twenty-five days. He underwent a general physical examination on August 20th. The official report of that examination shows the following: "The physical examination reveals a well developed, well nourished white male who does not appear to be acutely or chronically ill. The KENT examination [mental test] was within normal limits. There was no scars or signs of trauma on the tongue. The lungs were clear and resonant. Examination of the heart revealed no enlargement, no murmurs, regular rhythm, BP 140/90. Examination of the abdomen, genitalia, back, extremities, rectum and prostate were within normal limits. Neurological examination revealed the cranial nerves to be intact. The deep reflexes and superficial reflexes were physiological. No

pathological reflexes demonstrable. Romberg negative." Laboratory tests showed no abnormality of the urine, no cells in the spinal fluid, no increase of globulin, a normal chest, a negative skull and negative results from both the Kahn and Wasserman tests for syphilis. Except for a two-day period following a pneumoencephalogram the insured was without fever during the period of his stay in the hospital. The majority opinion refers to the fact that the insured had epileptic seizures while in the hospital. The hospital report clearly shows why. When he was admitted to the hospital the insured's dilantin sodium was discontinued and within a few days thereafter he had three convulsive seizures. He was placed back on dilantin sodium with supplemental phenobarbital and on the date of his discharge, according to the report, he was "well controlled on this therapy."

A part of the testimony of Dr. Rounasville with reference to the drug taken by the insured immediately prior to his death is quoted in the majority opinion. Not only did the witness testify that in his opinion the capsules "looked more like devinal sodium instead of dilantin sodium" and that devinal sodium "could" have a beneficial effect on a person suffering from epileptic seizures *"if* it were strong enough to curtail the seizures,"[1] but he also testified that he did not prescribe devinal sodium for epilepsy. The testimony of the witness on cross-examination with respect to the effect of dilantin sodium in suppressing epileptic seizures and on health is also quoted in the majority opinion and need not be repeated here. That the testimony of the witness was not shaken on re-direct examination, and that it was not given carelessly or without proper consideration is reflected in his testimony on re-direct examination, as follows:

"Q. Doctor, you just testified that a man with epilepsy, taking dilantin, can lead a normal life; is that correct?

"A. That is correct."

The testimony of Dr. Rounsaville is unequivocal. It is that an epileptic will not have seizures as long as he takes dilantin sodium in adequate dosage, and that when his seizures are so controlled and suppressed he can have a normal life in every respect and is in sound health for all purposes. If other members of the medical profession have a different opinion that fact does not appear in this record. Dr. Rounsaville's testimony is undisputed.

---

[1]Emphasis throughout this opinion the writer's unless otherwise indicated.

In determining whether there is in the record evidence of probative value in support of the jury verdict respondent is entitled to have considered all reasonable inferences arising from the facts proved. Biggers v. Continental Bus System, 157 Texas 351, 303 S.W. 2d 359, and cases there cited. From Dr. Rounsaville's medical training and experience and his knowledge of the insured's affliction, the jury could reasonably infer that dilantin sodium had been prescribed in adequate dosage to suppress epileptic seizures. From the testimony that the insured took the drug regularly except when he wished to test himself and that it was on such occasions that he had seizures, the jury could reasonably infer that he was taking the dilantin sodium in adequate doses and that it did, in fact, suppress his seizures. There is no direct testimony of any specific seizure occurring within the year immediately preceding the effective date of the policy and none of any seizure occurring between the date thereof and the date of the insured's death.

On the foregoing record should we hold, as a matter of law, that the insured was not in good health within the meaning of the policy? I respectfully submit that we should not. In answering the question it should be kept in mind that we are not concerned with whether the insured was in good health at and immediately preceding his death or on any other occasion when he was having a seizure; we are only concerned with the state of his health on April 15, 1953. Vann v. National Life & Accident Ins. Co., Texas Com. App., 24 S.W. 2d 347.

The term "good health" is comparative and relative. Hines v. Kansas City Life Ins. Co., Texas Civ. App., 260 S.W. 688, 690, writ dismissed; National Life & Accident Ins. Co. v. Moses, Texas Civ. App., 257 S.W. 289; Couch on Insurance, sec. 885a. The test of good health given by the trial court to and used by the jury in deciding the issue tracks the definition of "good health" given in Hines v. Kansas City Life Ins. Co., supra, and tracks also that approved in National Life & Accident Ins. Co. v. Moses, supra, as announced by Joyce on Insurance. 257 S.W. 291. It paralells the definition directly approved by this court in Sovereign Camp W.O.W. v. Derrick, Texas Civ. App., 64 S.W. 2d 982, 983, writ refused, in which the words "good health" are said to mean "a state of health free from any disease or ailment that affects the *general* soundness and healthfulness of the system *seriously, that is,* that the insured be not afflicted with a disease or bodily infirmity of a *substantial* nature, which affects the insured's *general* health, or which *materially* in-

creases the risk to be assumed by the insurer." The same definition is approved in Vann v. National Life & Accident Ins. Co., Texas Com. App., 24 S.W. 2d 347, 349, and in Southern Surety Co. v. Benton, Texas Com. App., 280 S.W. 551. There are other cases which define "good health" in slightly different language —see Couch on Insurance, sec. 885a-, but invariably the test invoked by the courts requires as a condition precedent to a holding of "bad health" that the insured be afflicted with a disease or infirmity which "affects the *general* soundness and healthfulness of the system *seriously*," or that *"materially* increases the risk to be assumed by the insurer," or that has "a *direct* tendency to shorten life," or that is *"grave, important* or *serious."*

The overwhelming weight of the evidence, indeed all of it—the lay testimony and the physical examination and laboratory tests at the Veterans hospital—, shows that the *general* soundness and healthfulness of the insured's system *was not seriously* affected by his ailment. That the lay testimony has probative force, see Coxson v. Atlantic Life Ins. Co., 142 Texas 544, 179 S.W. 2d 943; Vann v. National Life & Accident Ins. Co., Texas Com. App., 24 S.W. 2d 347; Texas Law of Evidence, 2d Ed. Vol. 2, sec. 1427, p. 271.

To support their conclusion that, as a matter of law, the insured was in bad health, the majority give no consideration to the legal definitions of "good health" to which reference has been made above, but turn instead to a statement by the Court of Civil Appeals in American National Life Ins. Co. v. Corley Co., 73 S.W. 2d 598, which is quoted with approval in American National Ins. Co. v. Lawson, 133 Texas 146, 127 S.W. 2d 294, 295, as follows: "His [the insured's] good faith in believing that he was in sound health at the time the policy was delivered will not authorize a recovery if in fact at the time of delivery of the policy he was suffering from an ailment of a substantial nature which continued and ultimately caused his death." In both of those cases the courts were dealing only with the question of whether lack of knowledge by the insured of his condition would avoid the effect of the "good health" provision of the policy; in neither did the court purport to lay down a legal definition or test of good health. The majority also cite Wright v. Federal Life Ins. Co., Texas Com. App., 248 S.W. 325, but in the opinion they reject the test announced in that case.

Even if we accept the language used in the Lawson and Corley Co. cases as a proper test, I respectfully submit that the

conclusion of the majority is still incorrect and insupportable for two reasons: (1) because the word "substantial," as used in the test, is given a meaning in this case wholly at odds with the meaning we have heretofore given it; and (2) because under the evidence in this case the question of whether the insured was, on the effective date of the policy, "suffering from an ailment of a *substantial* nature" is a fact question. These reasons will be discussed separately.

(1)    I can see no difference in meaning of the words "substantial" and "serious" as used in legal definitions or tests of "good health," as evidently neither do the majority since the words are used interchangeably in the opinion. In our unqualified approval of the opinion of the Court of Civil Appeals in Sovereign Camp W.O.W. v. Derrick, Texas 64 S.W. 2d 982, we approved that part of the opinion in which it is said that a disease or ailment which affects the general soundness and healthfulness of the system *seriously* does not embrace "an 'affection even though curable only by medical or surgical treatment, but nevertheless readily remediable and so not *necessarily* tending to shorten life, before it has become so far developed as to have some bearing in praesenti, upon the general health,' " and we approved also that further part in which it is said that such an "affection would not constitute a bodily infirmity of a *substantial* nature, nor *materially*, nor *necessarily* increase the risk of the insurer, *nor could it be said such an affection constituted bad health.*" We have thus said that diseases or ailments are not to be regarded as *serious* or *substantial* if they are readily remediable so as to have no bearing in praesenti upon the general health. As above pointed out, the record shows conclusively that the insured's affliction had had no effect on his general health when the policy became effective. If we may say that it is a matter of common knowledge that those afflicted with epilepsy of the grand mal type are subjected to *some* greater than normal risk of injury or death by the nature of the seizures which manifest the affliction, and accordingly that we may take judicial notice of that fact, we are immediately met with the medical testimony in this record that such added danger was easily remediable and could be eliminated by simple ministrations of dilantin sodium, and that at all times material to this inquiry it was so eliminated.

(2)    The majority opinion lays some stress on the fact that some nine months after the effective date of the policy the insured died during a series of seizures, inferably as the result

of having obtained the wrong drug. But in addition to the factor of death from an affliction, the test of the Lawson case recognizes the further factor that on the effective date of the policy the affliction must have been *substantial*. The majority opinion recognizes that death from an affliction is not the only factor in the test. An early death from an affliction is nothing more than evidence that the existing affliction at the effective date of the policy was *substantial* or *serious*. This is graphically illustrated by the fact that the insurer may cancel a policy for breach of the "good health" provision while the insured still lives. Let me illustrate: A and B each had pneumonia in the same stage of development when policies were delivered. A submitted to penicillin injections and was restored to normal health within a week, but B, because of his religious views, refused to submit thereto and died within a week. There is medical testimony that there was *some* danger of death of both from pneumonia at the time of delivery of the policies but that injection of penicillin in proper dosages would have rendered death wholly improbable. Suits are filed to cancel both policies for breach of the good health provisions. Would we say because B died his ailment was of substantial nature, as a matter of law, when his policy was delivered, but that the jury could find that A's was not because the medical testimony and his speedy recovery was evidence that it was easily remediable by proper treatment? It seems to me that the question of good health would have to be resolved by the same test in both cases and that in both it would be a fact question.

Although the insured in this case died from an affliction which he had on the effective date of the policy, the question still remains whether at that time the affliction was of such a serious or substantial character as to avoid the policy. This is the heart of the case, and, I submit, is a true fact question under the evidence in the case. The majority make short shrift of it on the ground that the insured undoubtedly "had epilepsy of the most serious type when he took out the policy." Granted. The statement is no more meaningful than one that the insured had acne in its most serious form. The question still remains: *how serious* was his epilepsy? It is in answering this question that the testimony of Dr. Rounsaville becomes all-important and, to my mind, controlling.

On the effective date of the policy the insured was in good general health. He was having no seizures. There is no evidence he had had any for many months preceding and none that he

had any thereafter until the time of his death. His seizures during the critical period had been suppressed and eliminated by the taking of dilantin sodium. Dr. Rounsaville's testimony is that one so situated "can lead his normal life and do anything anybody else can do," "can have a normal life in every respect," and "is in sound health for all purposes." "Sound health" and "good health" are synonymous terms. Soverign Camp W.O.W. v. Derrick, Texas Civ. App., 64 S.W. 2d 982, 983, writ refused; Couch on Insurance, sec. 885a.

The majority seem to discard Dr. Rounsaville's testimony that the insured was, in fact, "in sound health for all purposes" on the theory that it invades the province of this court to declare that, in law, he was not. I doubt the validity of the reasoning for it is well settled that even lay witnesses may express an opinion as to the state of a person's health. See Coxson v. Atlantic Life Ins. Co., 142 Texas 544, 179 S.W. 2d 943, 945; 19 Texas Jur. 354-357, Expert and Opinion Evidence, sec. 231, and cases there cited, and Texas Law of Evidence, 2d Ed., Vol. 2, sec. 1427, p. 271, and cases there cited. But if we may thus dispose of Dr. Rounsaville's testimony that the insured was in in "sound health," we cannot, on the same basis, ignore his testimony that the insured, with his seizures suppressed and eliminated, could lead a "normal life" and could "have a normal life in every respect." Reasonable inferences from the testimony are that the epilepsy, with seizures eliminated, would have no *serious* or *substantial* effect on the health of the insured and that he would have a normal life expectancy. The jury was not required to believe the testimony or to draw the inferences mentioned, Coxson v. Atlantic Life Ins. Co., 142 Texas 544, 179 S.W. 2d 943, 945, but it had a right to do so and this court should not annul the verdict on our conclusion, without supporting evidence, that the opinion expressed was unsound or incorrect.

The true basis of the majority position (although it is not so stated in the opinion) is that they have taken judicial notice that epilepsy, with all abnormal danger to health eliminated, nevertheless *seriously* and *substantially* affects health and breaches the policy provision. There is nothing in this record to show that a victim of epilepsy of the grand mal type, with seizures suppressed, is in any worse condition of health than is a victim of either of the milder forms of epilepsy with seizures suppressed. Through the device of judicial notice we thus narrow the area for the functioning of the jury or trial judge in "good health" cases well inside boundaries heretofore fixed by the courts, and do it on a record in which all the evidence,

both lay and expert, repels the conclusion we have reached. The inevitable result is that in all cases in which a disease or ailment, whatever *its* nature, exists at the time a policy is delivered and contributes to the insured's death we will appropriate first to ourselves the right to say, based upon judicial notice only, and even contrary to all the evidence adduced, that because the disease or ailment introduced *some* added element of danger to life it was therefore a serious or substantial one when the policy was delivered. This is hardly in harmony with most court decisions.

The effect that disease has on health is a subject on which doctors are peculiarly fitted by education and experience to testify and one on which judges are ill-fitted to pass without the aid of expert testimony. The general rule is that courts will not take judicial notice thereof. In Poignee v. John Hancock Mutual Life Ins. Co., Mo. App., 147 S.W. 2d 677, 683, writ of certiorari quashed, 348 Mo. 829, 155 S.W. 2d 250, the court refused to take judicial notice that diabetes was "a progressive, incurable disease." In General Accident Ins. Co. v. Hayes, Texas Civ. App., 113 S.W. 990, 992, no writ history, the court refused to take judicial notice that heart disease and paralysis were "non-confining illnesses." In American Casualty & Life Co. v. Gueringer, Texas Civ. App., 205 S.W. 2d 423, 424, no writ history, the court recognized that "the details of the nature and progress of the disease of cancer are not subjects of either common or judicial knowledge."

In a series of cases the courts of Alabama have refused to take judicial notice that the presence of certain diseases breached the good health provision of insurance policies. See Independent Life Insurance Co. v. Butler, 221 Ala. 501, 129 So. 466, 469, ("The diseases [high blood pressure, heart disease, or kidney disease] pleaded in these pleas as a breach of the alleged warranty [sound health] not being as a matter of common knowledge, such as would increase the risk, to sustain the plea defendant had the burden of showing that the insured was afflicted with the alleged diseases; that they were serious, and such as affected the general soundness of his health") ; Independent Life Ins. Co. v. Vann, 24 Ala. App. 93, 130 So. 520, 523 ("while the courts have said that certain diseases are, as matter of law, diseases which tend to shorten life and to materially increase the risk, in policies of life insurance, this court is not willing to add to the list the disease which at present is called 'ulcerated stomach' ") ; Louisiana State Life Ins. Co. v. Phillips, 223 Ala. 5, 135 So. 841, 842 ("This court does not judicially know

that syphilis increases the risk of loss") ; Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524, 525 (Defense was breach of "sound health" provision for that the insured was suffering from "cirrhosis of the liver, splenomegalia, oedema of the lungs, ascites or syphilis." The court said: "There are types of fatal maladies of which the courts take judicial knowledge, such as tuberculosis or cancer, as being material to the risk of insurance; the courts take no such knowledge of or as to the several forms of diseases such as syphilis, cirrhosis of the liver, or other ailments alleged in the pleas.").

The Texas cases I have examined in which it was held or assumed, as a matter of law, that a particular disease breached the good health provisions of a policy involve *tuberculosis,* American National Ins. Co. v. Lawson, 133 Texas 146, 127 S.W. 2d 294; Wright v. Federal Life Ins. Co., Texas Com. App. 248 S.W. 325; *Cancer,* Morris Ass'n of Brownwood v. Tatum, Texas Civ. App., 152 S.W. 2d 871; no writ history; advanced stage of *paresis* where insured was adjudged a lunatic before the policy was delivered and died 20 days after it was delivered, Phipps v. American National Ins. Co., Texas Civ. App., 116 S.W. 2d 800, writ dismissed; *pelvic cellulitis,* Hughes v. American National Ins. Co., Texas Civ. App., 146 S.W. 2d 470, no writ history, in which insured was treated in April, the policy was delivered on May 2nd and insured died on May 17th.

In a number of other cases, often referred to as involving holdings that certain diseases breached the condition as a matter of law, the appellate courts in reality affirmed judgments of trial courts in which the issue was treated as a fact question and "bad health" was found by the jury or trial judge. See as to *cancer* American National Ins. Co. v. Corley, Texas Civ. App., 73 S.W. 2d 598, no writ history; American Banker's Life Ins. Co. v. Pate, Texas Civ. App., 161 S.W. 2d 587, no writ history; *tuberculosis,* Southern Surety Co. v. Benton, Texas Com. App., 280 S.W. 551; *heart trouble,* Great National Life Ins. Co. v. Hulme, 134 Texas 539, 136 S.W. 2d 602; *influenza,* Ofield v. National Benefit Life Ins. Co., Texas Civ. App., 293 S.W. 271, no writ history; Denton v. Kansas City Life Ins. Co., Texas Civ. App., 231 S.W. 436, no writ history; *syphilis for which insured had been operated,* American National Ins. Co v. Crylstal, Texas Civ. App., 272 S.W. 262; *nature not shown,* American National Ins. Co. v. Jarrell, Texas Civ. App., 50 S.W. 2d 875, no writ history.

It thus appears that tuberculosis is the only disease, disclosed

by my research, which this court has held or assumed, on the basis of judicial notice, will breach the "good health" provision of an insurance policy, as a matter of law. I respectfully suggest that in this day of miracle drugs we should be most reluctant to extend it to other diseases, particularly to those with which a person may yet lead a normal life. Experience in recent years with veneral diseases, pneumonia and many other diseases which once claimed the lives of many of their victims should teach us that. The question should be regarded and treated as one of fact on which both parties are at liberty to offer evidence of the serious or non-serious effect of the particular disease on health, with the right in the appellate courts to reverse and remand when a verdict or a finding is contrary to the great weight and preponderance of the evidence and to reverse and render when there is no evidence to support a verdict or judgment. This matter should be dealt with as other questions are dealt with and should not be disposed of on the basis of judicial notice.

We have held that the burden is on the insurer to plead and prove a breach of the good health provisions of an insurance policy. Trevino v. American National Ins. Co., 140 Texas 500, 168 S.W. 2d 656, 659. Petitioner asks a judgment in this case (and the majority have awarded it) on a record absolutely devoid of such proof, and in so doing has left many questions bearing on the vital issue unanswered. Petitioner's district manager testified that petitioner will "consider" writing policies of insurance on the lives of epileptics. Are such policies written at normal or higher than normal premium rates? If higher than normal, how much higher? What is the normal life expectancy of epileptics similarly situated? How does it compare with the life expectancy of non-epileptics? What do the mortality experience tables show? How much greater is the risk in insuring the lives of epileptics? To what extent is the risk lessened by the regular taking of dilantin sodium? Is epilepsy ever the direct and immediate cause of death or is it only a secondary contributing cause? Are there members of the medical profession who are of the belief that epilepsy with seizures eliminated is a serious and substantial rather than a non-serious and insubstantial menace to life? If so, why was their testimony not offered on the trial? These questions clamor for answer by the party which had the burden of proof; but by taking judicial notice that the insured was in bad health because he was an epileptic we have not only relieved the insurer of its burden and supplied answers which we cannot judicially know but at

the same time have made it impossible for an epileptic-insured to prove that the disease or ailment did not seriously affect his health or materially increase the risk of the insurer.

This is not a case in which the evidence shows that on the effective date of the policy the insured was in the last stage of a fatal illness from which death followed in a few days, or a few weeks, or even in a relatively few months. In this case, on the basis of judicial knowledge, we reject the testimony of one doctor, although it is in the strongest possible terms; and once having done it, we must in the next case of epilepsy reject all evidence of good health even if there should be ten doctors testifying that the affliction had no serious effect on the health of the insured and would not *materially* affect his normal life expectancy. If we are right in the conclusion we reach through judicial notice then undoubtedly petitioner could have produced evidence to support the conclusion, and had it done so it might well have convinced the jury as many insurers have done in other cases (see cases cited supra) and thus have had its victory at the initial stage of this proceeding.

I would affirm the judgments of the courts below on the ground that the jury finding was supported by evidence of probative force, and accordingly would not reach the question of waiver discussed in the majority opinion.

Opinion delivered November 20, 1957.

Rehearing overruled December 18, 1957.