**E. D. DICKSON, Individually and as Community Survivor, Appellant,**

v.

**The MINNESOTA MUTUAL LIFE INSURANCE COMPANY, Appellee.**

No. 1079.

Court of Civil Appeals of Texas, Tyler.

Feb. 23, 1978.

Rehearing Denied March 23, 1978.

Samuel M. George, Weldon McFarland, law office of Weldon McFarland, Tyler, for appellant.

Mike Hatchell, Ramey, Flock, Hutchins, Grainger & Jeffus, Tyler, for appellee.

MOORE, Justice.

This is a suit for the recovery of proceeds of a credit life insurance policy. Plaintiff, E. D. Dickson, individually and as community survivor of the estate of his wife, Joyce Dickson, brought suit upon an insurance policy against defendant, Minnesota Mutual Life Insurance Co., pursuant to the terms of a group insurance policy in effect for members of the Cooperative Teachers Credit Union of which deceased, Mrs. Dickson, was a member. The insurance company denied liability on the ground that Mrs. Dickson did not qualify for coverage because on January 30, 1973, the date she applied for the loan and the date the loan was made, Mrs. Dickson was suffering from terminal cancer.

The cause was submitted to the jury on one special issue inquiring whether Joyce Dickson on January 30, 1973, was physically able to perform, or may have been expected within a reasonable time to resume, her duties as a schoolteacher. The jury answer-

ed the issue in favor of the plaintiff. Defendant moved for judgment non obstante veredicto on the ground that there was no probative evidence to support the verdict. The trial court granted the motion and rendered judgment for defendant, from which ruling plaintiff duly perfected this appeal.

We affirm.

The following facts are not in dispute. Mrs. Dickson was a junior high school teacher in the Winona Public School System. In October of 1972, Mrs. Dickson was examined by a Dallas physician, Dr. R. J. Rowe, who diagnosed her gastrointestinal complaint as a cancerous colon. Shortly thereafter she underwent exploratory surgery at which time it was confirmed she had cancer of the colon. At this time Dr. Rowe was of the opinion that Mrs. Dickson's condition was terminal, but advised her that she would be able to return to work. From October of 1972 till her death in February of 1973 Mrs. Dickson was on temporary leave of absence from her teaching duties and was undergoing radiation treatment in Dallas under the supervision of Dr. R. E. Collier.

In November of 1972 Mr. and Mrs. Dickson ordered a new Lincoln Continental automobile with the intention of financing the same with the Cooperative Teachers Credit Union in Tyler. The amount of the loan was $7,006.90. Under the agreement with the insurance company, when a member borrowed from the Credit Union the member was automatically covered by insurance for the unpaid balance, provided certain eligibility requirements were met. The eligibility clause of the credit life insurance policy provided as follows:

"All members under age 70 who become indebted to the Credit Union subsequent to the date of the issue of this policy, and who are physically able to perform, or within a reasonable time may be expected to resume, the usual duties of their livelihood, shall become eligible for insurance on the date of their indebtedness."

On January 30, 1973, the date the loan was made, Mrs. Dickson filled out and signed on that same day the required loan application form from the Credit Union, which was mailed later in the day. Immediately after dropping the application in the mail Mr. and Mrs. Dickson drove to Dallas so that, among other things, she might be examined for relief of a "nausea experience" resulting from radiation treatments. Mrs. Dickson was examined by Dr. Rowe on February 1st, at which time he discovered that she had recurrent cancer in the form of a large tumorous mass, the size of a football, which obstructed her colon. Her pain was so severe that morphine was required to relieve her suffering. Dr. Rowe informed Mr. Dickson that his wife would not live very long, and a few days later, on February 7th, she died.

Plaintiff alleged that under the terms of the policy his wife was eligible for coverage. The cause was submitted to the jury upon the following special issue, which was answered in favor of plaintiff:

"Do you find from a preponderance of the evidence that on January 30, 1973, Mrs. Joyce A. Dickson was physically able to perform, or within a reasonable time, may have been expected to resume the usual duties of her livelihood, namely as a school teacher?"

On appeal plaintiff urges that the court erred in granting defendant's motion for judgment n. o. v., because the testimony given by the lay witnesses as to her condition was of sufficient probative force to support the jury's verdict.

█ A judgment n. o. v. is proper only where there is no evidence of probative value to support the submission of a special issue. *Harbin v. Seale*, 461 S.W.2d 591 (Tex.1970). In acting upon a motion for judgment n. o. v., all testimony must be considered in the light most favorable to the party against whom the motion is sought, and every reasonable intendment deducible from the evidence is to be indulged in that party's favor. *Douglass v. Panama, Inc.*, 504 S.W.2d 776 (Tex.1974).

The evidence presented at the trial consisted of both medical and lay testimony. The medical evidence consisted primarily of the deposition testimony of Dr. Rowe. Dr. Rowe testified that when he examined Mrs.

Dickson on February 1st, she had a protrusion in her abdomen, revealing a football-size hard mass, which meant to him that she had recurrent cancer. He further testified that she was having nausea, had been vomiting, had not been able to eat, and was in severe pain requiring morphine every four to six hours. When asked of his opinion as to her general state of health during the week prior to February 1st, he testified that he was sure that she had been in poor condition for several days before the February 1st diagnosis. He stated that "she was obviously fatigued, pale, and that doesn't occur just overnight." Dr. Rowe also testified that he received a copy of a letter dated January 29th from Dr. Collier, the physician who was administering her radiation treatments. Dr. Collier wrote that Mrs. Dickson's tumor was not responding to treatment and that it was spreading outside the treated area. He further wrote that because of increasing pain which Darvon was not relieving she was given a prescription for Demerol, a narcotic-type drug used for extreme pain. Dr. Rowe testified that, based on his knowledge of her condition and on the letter received from Dr. Collier dated January 29th, he was of the opinion that Mrs. Dickson's physical condition was such that she could not have performed her usual duties as a schoolteacher on January 30, 1973, and that she could not have been expected within a reasonable period of time, or in fact ever, to resume such duties.

Other relevant evidence presented at trial consisted of the testimony of Mr. Jimmy Fox, Superintendent of the Winona School System, and Mrs. Mamie Jones, a secretary at the Winona Elementary School, who testified that Mrs. Dickson appeared in good health and that they expected her to return to work. Mr. Fox testified that around the middle or first part of January Mrs. Dickson visited with him in his office, and that "she seemed to be like any other time that I could see." He further testified that he expected her to return to her classroom duties shortly. He testified that a few days later he and his wife visited the Dicksons at their home and had dinner with them at a restaurant, and that at that time she appeared to be normal. Mrs. Jones testified

that Mrs. Dickson visited the school sometime in January and that at such time "she was looking fine and excited about coming back." She further testified that during the latter part of January she visited Mrs. Dickson at her home, and that at that time she was conducting her usual household duties and looked better than she did when she previously saw her at school. She testified that at no time did she observe anything about her which led her to believe that she would not be able to return to work.

Plaintiff, E. D. Dickson, testified that in his opinion his wife had been making continual improvement. He testified that based upon his observations of her he knew that she would return to work. He further testified that on January 30th Mrs. Dickson was feeling fine. He testified that on that date she vacuumed the carpets and drove part of the way on their trip to Dallas.

Plaintiff takes the position that, despite the testimony of Dr. Rowe, the foregoing lay testimony is of sufficient probative force to create an issue of fact as to whether Mrs. Dickson was physically able to perform her duties of a schoolteacher on January 30, 1973, or within a reasonable time might be expected to resume the usual duties of a schoolteacher. He therefore argues that the jury's finding must be sustained. We do not agree.

At the outset we hasten to point out that we have found no Texas case involving an eligibility clause similar to the one presented here. However, there are numerous Texas cases involving the proof necessary to establish eligibility for life insurance coverage under a typical "good health" or "sound health" provision. These cases generally hold that the requisites of a "good health" provision in a life insurance policy are not met if the applicant is suffering from a serious kind of illness which continues and eventually causes his death. *Great American Reserve Insurance Co. v. Britton*, 406 S.W.2d 901 (Tex.1966).

While we are aware of the fact that the eligibility clause involved in the instant case is not the same as a "good health" or

"sound health" provision in an ordinary life insurance policy, we think the clause bears some similarity in that it contemplates that an applicant's health be good enough to enable her to perform the usual duties of her occupation, or good enough such that she might be expected to resume such duties within a reasonable time. While the clause here does not require an applicant to be in perfect or even good health in order to be eligible for insurance, an applicant's eligibility perforce turns to a large degree on the status of her health. As applied to the instant case we believe the clause contemplates that Mrs. Dickson be in good enough health to teach school on the date of her loan, or that her health be such that she could reasonably be expected to do so within a reasonable time. Consequently, since the eligibility clause here is inherently concerned with the applicant's health, we think the principles of law applicable in cases involving "good health" provisions are equally applicable to the instant situation.

■ In cases involving insurance provisions requiring "good health," it is held that lay testimony as to one's impressions of the applicant's appearance and health during a specified period of time is admissible to show the state of deceased's health at the time of the issuance of the policy, and that such testimony may in some instances be sufficient to create an issue of fact, even when contrary to uncontroverted opinions and inferences of medical experts, particularly when the situation is such that reasonable minds might differ as to the existence or extent of a disease at the time of the issuance of the policy. *Coxson v. Atlanta Life Insurance Co.,* 142 Tex. 544, 179 S.W.2d 943 (1944). This is not to say, however, that in *every* case lay testimony may create an issue of fact as to a person's good health despite uncontroverted medical testimony to the contrary. For example, in *Texas Prudential Insurance Co. v. Dillard,* 158 Tex. 15, 307 S.W.2d 242 (1957), the court stated that, despite lay testimony of deceased's generally healthy appearance and activity, the medical testimony conclusively established the existence of epilepsy in its worst form at the time of the issuance of the policy. The court indicated that in light of such medical testimony there was no other choice but to hold, as a matter of law, that deceased was not in "good health" at the time of the issuance of the policy. We quote from that opinion:

"There is no doubt that at the time the policy was issued, the insured was afflicted with a disease that produced and had been producing, the same sort of seizures or convulsions from which he died some nine months later. . . . The generally 'normal' appearance and behavior of the insured and the even robust character of his general physique lose all of their significance as evidence of good health or against bad health, once it is made clear, as it is, that, at the critical time, he actually had the disease and in its worst form. . . . An individual may appear quite robust to his employer, family and friends and be himself conscious of no serious ailment and yet turn out to have had beyond doubt a dangerous disease that no insurer would care to risk. To say that such testimony of apparent good health is admissible is not necessarily to say that it creates a fact issue regardless of all other evidence in the case." 307 S.W.2d at 246.

In *Reliable Life Insurance Co. v. Williams,* 514 S.W.2d 768 (Tex.Civ.App.—Beaumont 1974, no writ), the jury found, based upon lay testimony that the deceased appeared in good health, that deceased was in fact in good health on the date of the issuance of a life insurance policy. The uncontroverted medical testimony established that the deceased was admitted to the hospital on November 17th for treatment for a chest lesion; that on March 12th, the very date the insurance policy became effective, he was again admitted to the hospital and diagnosed as having lung cancer, from which he died three weeks later. The physician testified that in his opinion he had lung cancer before March 12th and was not in good health on that date. The court reversed and rendered the case holding that the evidence showed as a matter of law that the insured was not in good health at the time the policy became effective.

In *Reliable Life Insurance Co. v. Gray,* 464 S.W.2d 412 (Tex.Civ.App.—Texarkana 1971, writ ref'd n. r. e.), the jury found, based upon lay testimony as to deceased's generally healthy appearance and performance of household activities, that deceased was in good health at the time of the issuance of the policy. Medical testimony demonstrated that, at the time of the issuance of the policy on May 13th, the applicant was suffering from cancer, from which she died a month later. The court stated that the testimony showing the appearance of good health and the performance of household duties did not exclude the existence of the cancerous condition on May 13th. The court held that the medical evidence conclusively established that the deceased was not in good health on May 13th and that no issue of fact was presented for jury determination. Also see *Travis Life Insurance Co. v. Rodriguez,* 326 S.W.2d 256 (Tex.Civ.App.—Austin), writ ref'd n. r. e., 160 Tex. 182, 328 S.W.2d 434 (1959); *Lincoln Income Life Insurance Co. v. Mayberry,* 162 Tex. 492, 347 S.W.2d 598 (1961).

It is undisputed that Mrs. Dickson had been suffering from cancer four months before her death, and that her death was caused by cancer. Furthermore, it is undisputed that she was on leave of absence from her classroom duties as a result of her condition and was regularly taking radiation treatment as well as pain-relieving medication. In light of these facts we do not believe that the lay testimony, based solely on observations of physical appearance and light activity, to the effect that Mrs. Dickson was in good enough health to perform the usual duties of schoolteaching or could be expected to return to such duties within a reasonable time, was of sufficient probative force to support the jury's finding.

This leaves only the medical testimony, showing that Mrs. Dickson was in such a serious state of health as a result of recurrent cancer that she was not physically able to perform the usual duties of a schoolteacher and could not have been expected to do so within a reasonable time. As we view the record, this is not a situation where reasonable minds might differ as to

Mrs. Dickson's present or future capability to perform her usual work as a schoolteacher. Accordingly, we find no error in the ruling made by the trial court.

The judgment of the trial court is affirmed.